760 F.2d 514
 SMYSER, Robert L., Smyser, Rodney R., Smyser's Richlawn
Farms, Fetrow, Howard S., Fetrow, Ralph E.,
Blue-Knoll Farms, Beshore, E. Wayne,
Beshore, Jed, Beshore Farms
v.
BLOCK, John R., Secretary of Agriculture and United States
Department of Agriculture,
Dairymen, Inc. Defendant-Intervenor.
Inter-State Milk Producers' Co-Op, Maryland & Virginia Milk
Producers Association, Middle Atlantic Division of Dairymen,
Inc., Capitol Milk Producers, Inc., Lehigh Valley Farmers,
Valley of Virginia Cooperative, Pennmarva Dairymen's
Federation, Inc., Defendants-Intervenors.
Appeal of Robert L. SMYSER, Rodney R. Smyser, Howard S.
Fetrow, Ralph E. Fetrow, E. Wayne Beshore and Jed Beshore.
 No. 84-5297.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 11, 1984.
Decided April 30, 1985.
As Amended May 9, 1985.
 
 Marvin Beshore (Argued), Beshore & Bickley, Harrisburg, Pa., for appellants.
 D. Paul Alagia, Jr., Richard A. Gladstone, John F. Sherlock, III, John J. McLaughlin, Barnett & Alagia, Washington, D.C., for appellee Dairymen, Inc.
 Donald F. Copeland, Speese, Bongiovanni & Copeland, Philadelphia, Pa., for appellees Interstate Milk Producers Co-op, et al.
 David Dart Queen, U.S. Atty., David C. Shipman, Asst. U.S. Atty., Harrisburg, Pa., James Michael Kelly, Associate Gen. Counsel, Raymond W. Fullerton, Asst. Gen. Counsel, Aaron B. Kahn (Argued), U.S. Dept. of Agriculture, Washington, D.C., for appellees John R. Block and the U.S. Dept. of Agriculture.
 Before GARTH and HIGGINBOTHAM, Circuit Judges, and McGLYNN, District Judge.*
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 This is an appeal from a summary judgment of the district court sustaining the validity of certain "emergency" amendments to Department of Agriculture orders regulating the marketing of milk in the Middle Atlantic area, 7 C.F.R. part 1004 (1984), pursuant to the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. Sec. 601 et seq. (1982) ("the Act"). Because we find that the Secretary of Agriculture ("the Secretary") lacked statutory authorization to enact these amendments, we will reverse the judgment of the district court.
 
 I.
 
 2
 This appeal requires us to "traverse the labyrinth of the federal milk marketing regulation provisions." Zuber v. Allen, 396 U.S. 168, 172, 90 S.Ct. 314, 317, 24 L.Ed.2d 345 (1969) (footnote omitted) (per Harlan, J.). It will be helpful to first summarize, in simplified form, the salient features of the regulatory scheme, and then the specific events leading to this appeal.
 
 A. The Regulatory Scheme
 
 3
 For the past half-century the marketing of milk in a large portion of the United States has taken place under a federal regime designed to "establish and maintain such orderly marketing conditions ... as will establish, as the price to farmers, parity prices...." 7 U.S.C. Sec. 602(1). The terms and conditions that the Secretary may include in "orders" regulating the marketing of milk and its products are found in subsections 8c(5) and 8c(7) of the Act, 7 U.S.C. Secs. 608c(5), 608c(7). These provisions were intended to address the "two distinctive and essential phenomena of the milk industry" that had previously led to disorderly marketing conditions and depressed prices: "a basic two-price structure that permits a higher return for the same product, depending on its ultimate use, and the cyclical characteristic of production." Zuber v. Allen, 396 U.S. at 172, 90 S.Ct. at 317.
 
 
 4
 Because cows produce significantly more milk in the Spring and Summer than in the Fall and Winter, while demand is relatively steady year-round (with some drop-off when schools are out of session), dairy farmers ("producers") must maintain herds that are sufficient to meet the Fall and Winter demand for the fluid milk products that cannot be stored for long periods of time, even though this will result in an inevitable surplus--known as the "Spring flush"--when production is at its peak. This surplus milk is directed to non-fluid uses, such as the manufacture of cheese and butter, for which milk can be transported and stored in less perishable form. Milk that is ultimately used for fluid purposes has traditionally commanded a higher price than milk of the same grade and quality used for manufactured products. This difference is not entirely accounted for by differences in cost. In an unregulated market "cutthroat" competition for the more profitable fluid milk sales can lead to an overall decline in prices. See generally Brooks. The Pricing of Milk Under Federal Marketing Orders, 26 Geo.Wash.L.Rev. 181, 181-83 (1958). It was this scenario that Judge Jerome Frank had in mind when he wrote that milk often provoked "as much human strife and nastiness as strong alcoholic beverages." Queensboro Farms Products v. Wickard, 137 F.2d 969, 974 (2d Cir.1943).
 
 
 5
 The regulatory scheme authorized by the Act is designed to prevent such strife by having all producers in a regional market share equally in the burden created by surplus milk. This is generally accomplished, as in the Middle Atlantic area, through the marketwide pooling of milk under "orders" issued by the Secretary. The orders may classify milk according to its ultimate use--fluid (Class I) or "non-fluid" (Class II and Class III)--and fix uniform minimum prices that all "handlers" (the middlemen who process and market milk) must pay for each class, "subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers." 7 U.S.C. Sec. 608c(5)(A).
 
 
 6
 While handlers pay a higher uniform minimum price for Class I milk, producers receive one uniform price--the "blended" price--for all their milk irrespective of its ultimate use, subject to the same enumerated adjustments. 7 U.S.C. Sec. 608c(5)(B). Additional adjustments are authorized to encourage steady production levels year-round. Thus, 7 U.S.C. Sec. 608c(5)(B)(ii)(d) authorizes the establishment of "base-excess" plans, under which producers receive only the lower Class II or Class III price for production in the Spring months that exceeds their Fall "base" production level. See, e.g., 7 C.F.R. Sec. 1004.90 (base-excess plan for the Middle Atlantic area). 7 U.S.C. Sec. 608c(5)(B)(ii)(e) authorizes so-called "Louisville" plans whereby the blended price is reduced in the Spring and the accumulated funds disbursed to producers in the Fall. See H.R.Rep. No. 1329, 91st Cong., 2d Sess. 17-19 (1970).
 
 
 7
 The blended price is, roughly speaking, the weighted average uniform price of all milk of all use classifications sold under the order during a given period. By paying a farmer according to the marketwide utilization of milk rather than according to the utilization of his particular milk, competition among farmers to sell their milk for fluid use is eliminated. The discrepancy between what handlers pay and what producers receive for their milk is reconciled through a "Producer Settlement Fund." Handlers whose "use value" (the weighted average uniform price of the milk they purchased) exceeded the blended price for the relevant period must contribute the difference to the fund, and handlers whose use value was less than the blended price may withdraw the difference from the fund. 7 U.S.C. Sec. 608c(5)(C); see, e.g., 7 C.F.R. Sec. 1004.70 (Producer Settlement Fund for the Middle Atlantic area). See generally Kessel, Economic Effects of Federal Regulation of Milk Markets, 10 J. Law & Econ. 51, 54-55 (1967).
 
 
 8
 The Act authorizes the Secretary to include a variety of additional specified terms in orders, see, e.g., 7 U.S.C. Sec. 608c(5)(I) (providing for research, development and advertising projects financed by the deductions from the blended price), as well as terms or conditions "[i]ncidental to, and not inconsistent with, the terms and conditions specified in subsections (5) to (7) of this section and necessary to effectuate the other provisions of such order." 7 U.S.C. Sec. 608c(7)(D). There are currently 45 regional marketing orders in effect. The Middle Atlantic order, covering portions of Pennsylvania, New Jersey, Delaware, Maryland, Virginia, and the District of Columbia, is codified at 7 C.F.R. part 1004.
 
 B. The 1982 and 1983 Amendments
 
 9
 On March 10, 1982 the Secretary published notice of a hearing to consider amendments to nine regional milk marketing orders, including the Middle Atlantic order, proposed by appellee Dairymen, Inc. ("DI"), 47 Fed.Reg. 10,23 0. DI is a cooperative association of milk producers. Cooperatives, which process and market the milk of their member producers (and therefore are handlers under the Act), are the dominant forces in the dairy industry, with "independent" producers and "proprietary" handlers accounting for only a small portion of the market. DI anticipated an extraordinary surplus of milk in these nine markets during the 1982 Spring flush, due to an increase in production and decrease in the number of milk processing plants, and as a result of this surplus an extraordinary expense in transporting milk to processing plants in other markets in order to relieve the glut. DI contended that this movement of surplus milk would benefit all participants in the market, but that major handlers would bear a disproportionate share of the cost of clearing the glutted markets. DI proposed that handlers be given a "transportation credit" against their pool obligation for the cost of shipping surplus milk outside of designated geographic areas during the months of April-June, 1982. The result of such a credit would be that all producers would share the cost through a reduction in the blended price.
 
 
 10
 A hearing on DI's proposed amendments was held on March 16-17, 1982 in East Point, Georgia. Most of the testimony, primarily by representatives of other cooperatives and proprietary handlers, opposed the credits. A representative of appellees Pennmarva Dairymen's Federation, Inc. ("Pennmarva"), made up of five cooperatives including the Middle Atlantic Division of DI, and the Valley of Virginia Cooperative Milk Producers Association, which together market over 85 percent of the milk pooled under the Middle Atlantic order, opposed DI's proposal and suggested instead the temporary elimination of "location" adjustments to the uniform price for Class II milk that, they contended, were resulting in "uneconomic movements of milk." In a statement on behalf of the same group, excluding the Middle Atlantic Division of DI, it was contended that some cooperatives had expanded their capacity for handling in anticipation of increased production, and that it would be unfair for their producers to share the costs incurred by others who were not prepared. Other witnesses expressed similar concerns, and also noted that the movement of milk subsidized by the credits might cause displacements in neighboring markets. A number of proprietary handlers argued that cooperatives that transported surplus milk to their processing plants would recoup their transportation costs through the premium "over-order" charges (i.e., prices in excess of minimums set by the orders) already in effect.
 
 
 11
 The Secretary's findings generally supported DI's position:
 
 
 12
 Under normal conditions of supply and demand for fluid milk, the Federal order marketwide pools serve to assure that all producers supplying each market share in both the Class I and surplus values of the milk that is pooled in their market. Such pooling is normally adequate to achieve reasonable equity among all the market's producers. However, in the unusual circumstances that currently exist in much of the Southeast and the Middle Atlantic area, the orders do not provide a mechanism for ensuring that unusually high costs incurred in handling a market's surplus milk are shared equitably by all producers on that market. In those markets where the record indicates that such movements of milk most likely will occur in substantial quantities, the orders should be amended along the lines proposed to maintain the degree of producer equity that otherwise is obtained through the operation of marketwide pools.
 
 
 13
 Emergency Decision on Proposed Amendments to Marketing Agreements and Orders, 47 Fed.Reg. 17,530, 17,536 (1982). Amendments providing for temporary transportation credits, in substantially the form proposed by DI, were added to six orders, including the Middle Atlantic order. The Secretary found statutory authority for the amendments in 7 U.S.C. Sec. 608c(7)(D):
 
 
 14
 [S]uch credits represent an additional mechanism in the order for maintaining a reasonable degree of equity among all producers whose milk is pooled and priced under the order. The authority for such a provision is section 608c(7)(D) of the Act, which provides that an order may contain terms and conditions incidental to, and not inconsistent with, other provisions of the Act if such terms and conditions are necessary to effectuate the other provisions of the order.
 
 
 15
 One of the underlying purposes of the Act is to establish orderly marketing conditions for dairy farmers. The Act authorizes a number of specific means for achieving this, including the pooling of milk on a marketwide basis....
 
 
 16
 The pool credits adopted herein are an extension of this marketwide sharing concept. As already described, unusual supply-demand conditions are resulting in certain producers bearing an inequitable share of the costs of handling excess milk supplies associated with the fluid markets. The pool credits represent a reasonable means of maintaining orderly marketing conditions for producers.
 
 
 17
 47 Fed.Reg. at 17,538.
 
 
 18
 This final decision was issued without affording interested parties an opportunity to file exceptions to a recommended decision. The Secretary deemed this "emergency" expedited procedure necessary in order to have the amendments in place in time for the Spring flush. The Middle Atlantic credits were applicable to shipments made from May 21, 1982 through the end of June, 1982. In 1983, after another expedited hearing and decision procedure that appellants aptly describe as an "instant replay" of 1982, the Secretary adopted virtually identical amendments to four marketing orders, including the Middle Atlantic order, providing transportation credits for shipments made between April 15, 1983 and June 30, 1983. Emergency Decision on Proposed Amendments to Marketing Agreements and Orders, 48 Fed.Reg. 14,604 (1983). The 1983 amendment to the Middle Atlantic order, identical in all material respects to the 1982 amendment, provided as follows:
 
 
 19
 The net pool obligation of each pool handler for each pool plant, and of each cooperative association handler pursuant to Sec. 1004.9(b) and (c) with respect to milk which was not received at a pool plant, shall be a sum of money computed by the market administrator as follows:
 
 
 20
 ....
 
 
 21
 (f) With respect to milk marketed on and after the effective date hereof through June 1983, subtract the amount obtained by multiplying the pounds of bulk fluid milk products that were transferred or diverted from a pool plant to a nonpool plant and classified as Class II milk pursuant to Sec. 1004.42(d) or Sec. 1004.42(e)(3) by a rate for each truckload of milk so moved that is equal to 3.6 cents per hundredweight for each 10 miles or fraction thereof that the nonpool plant is located more than 200 miles (as determined by the market administrator) from the nearest of the following locations: the city hall in Philadelphia, Pennsylvania; the zero milestone in Washington, D.C.; the city hall in Baltimore, Maryland; the transferor plant; or, for diversions, the pool plant of last receipt for the major portion of the milk on the load or the courthouse of the county where the major portion of the milk so diverted was produced. No credit shall apply to the total quantity of milk so moved to a given nonpool plant by a handler during the month if any portion of the milk is assigned to Class I.
 
 7 C.F.R. Sec. 1004.60
 
 22
 Appellants, independent producers under the Middle Atlantic order, filed suit against the Secretary and the Department of Agriculture on April 27, 1983, seeking a declaratory judgment that the 1982 and 1983 amendments were void and injunctive relief that would enable them to recover monies they lost due to the reduction in the blended price that resulted from issuance of the transportation credits. Appellees DI and Pennmarva intervened as defendants. Appellees stipulated that the transportation credits would be repaid if found to be invalid. Appellants sought to proceed as a class consisting of all producers under the Middle Atlantic Georgia (7 C.F.R. Sec. 1007), Tennessee Valley (7 C.F.R. Sec. 1011), and Louisville-Lexington-Evansville (7 C.F.R. Sec. 1046) marketing orders, all of which were amended to provide transportation credits in both 1982 and 1983. The district court deferred action on the motion for class certification pending its resolution of cross-motions for summary judgment. The district court has not ruled on class certification, and the opinion accompanying its order entering summary judgment for appellees referred only to the Middle Atlantic order. Smyser v. Block, 580 F.Supp. 1397 (M.D.Pa.1984). The record indicates that approximately $450,000 in transportation credits were issued under the challenged 1982 and 1983 amendments to the four marketing orders, resulting in an equivalent reduction in the revenues of the more than 13,000 producers in the class appellants here seek to represent.
 
 II.
 
 23
 Appellants contend that the 1982 and 1983 amendments to the Middle Atlantic order are invalid on three grounds: (1) the transportation credit is not a term or condition authorized by the Act; (2) the Secretary acted arbitrarily and capriciously by not considering evidence regarding cooperative association revenues from premium over-order charges; and (3) the Secretary's repeated use of emergency rulemaking procedures in this case violated Administrative Procedure Act Sec. 557(b)(2), 5 U.S.C. Sec. 557(b). For the reasons set forth below, we hold that the Secretary lacked statutory authorization to enact the transportation credit. We do not reach appellants' other contentions.
 
 
 24
 In enacting the transportation credit, the Secretary relied on Sec. 8c(7)(D) of the Act, which authorizes him to include terms or conditions in marketing orders that are "[i]ncidental to, and not inconsistent with, the terms and conditions specified in subsections (5) and (7) of this section and necessary to effectuate the other provisions of such order." 7 U.S.C. Sec. 608c(7)(D). If we are to sustain the Secretary's action, it must be on the basis of this provision. SEC v. Chenery Corp., 318 U.S. 80, 87, 95, 63 S.Ct. 454, 459, 463, 87 L.Ed. 626 (1943); 3 K. Davis, Administrative Law Treatise Sec. 14.29 (2d ed. 1980). We will limit our attention to the first requirement for terms promulgated under this residual authority: that they be "incidental" to terms specified in the statute. See Brooks, supra, 26 Geo.Wash.L.Rev. at 203 ("The structure of the act shows that the three conjunctive conditions, scil., incidental, necessary, and not inconsistent, are to be given meaning and significance, depending on the facts in a particular situation."). Appellants argue that this provision gives the Secretary some discretion to fill in the details necessary to implement the specifically authorized marketwide sharing mechanisms, but not authority to create what the Secretary termed an "additional mechanism" that was "an extension of [the] marketwide sharing concept." Appellees argue, and the district court agreed, that any terms which further the Act's purpose, i.e., promoting the orderly marketing of milk through marketwide sharing, are "incidental" within the meaning of this provision. Our reading of the legislative history and case law leads us to conclude that the transportation credit, even if it promotes or is necessary for the orderly marketing of milk, is not authorized under the Act as an "incidental" term or condition.
 
 
 25
 The provisions of the Act governing milk marketing orders were first enacted in substantially their present form as amendments, 49 Stat. 750, 753-57, to the Agricultural Adjustment Act of 1933, 48 Stat. 31, in the aftermath of the Supreme Court's decision in A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). Schechter struck down, as an unconstitutional delegation of legislative authority, sections of the National Industrial Recovery Act that purported to give the President authority to approve or prescribe industrial codes of fair competition that would "tend to effectuate the policy" of the Recovery Act, i.e., the rehabilitation of trade or industry. 295 U.S. at 538, 55 S.Ct. at 847. The Recovery Act, the Court found,
 
 
 26
 supplies no standards for any trade, industry or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of facts determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. For that legislative undertaking, section 3 sets up no standards, aside from the statement of the general aims of rehabilitation, correction and expansion described in section one. In view of the scope of that broad declaration, and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered. We think that the code-making authority thus conferred is an unconstitutional delegation of legislative power.
 
 
 27
 295 U.S. at 541-42, 55 S.Ct. at 848-49.
 
 
 28
 The committee reports accompanying the 1935 agriculture amendments make it abundantly clear that the provisions for milk marketing orders were carefully drafted to avoid any delegation problem. "To eliminate questions of improper delegation of legislative authority raised by the decision in Schechter et al. v. United States, the provisions relating to orders enumerate the commodities to which orders issued by the Secretary of Agriculture may be applicable, prescribe fully the administrative procedure to be followed by the Secretary in issuing, enforcing, and terminating orders, and specify the terms which may be included in orders dealing with the enumerated commodities." S.Rep. No. 1011, 74th Cong., 1st Sess. 8 (1935) (emphasis added); H.R.Rep. No. 1241, 74th Cong., 1st Sess. 8 (1935). The preamble to Sec. 8c(5) of the Act states: "In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others." 7 U.S.C. Sec. 608c(5) (emphasis added).
 
 
 29
 In light of this history and this language, we cannot believe that Congress intended, by permitting the Secretary to include terms "incidental" to those specified, to delegate the authority to fashion any "additional mechanisms" that promote the "concept" of the Act. Rather, "[a]vailable indicia of congressional intent at the time of enactment lend weight to the contention that specific provision would have been made for this kind of payments ... if they were meant to be made." Brannan v. Stark, 342 U.S. 451, 465, 72 S.Ct. 433, 440, 96 L.Ed. 497 (1952) (footnote omitted). See also Zuber v. Allen, 396 U.S. at 183, 90 S.Ct. at 323 ("The statute before us does not contain a mandate phrased in broad and permissive terms. Congress has spoken with particularity.... In these circumstances an administrator does not have 'broad dispensing power.' "). Appellees' broad reading of the Act is reminiscent of the position Justice Hugo Black long and consistently espoused in dissent, see Zuber v. Allen, 396 U.S. at 197-211, 90 S.Ct. at 330-337; Lehigh Valley Cooperative Farmers v. United States, 370 U.S. 76, 100-113, 82 S.Ct. 1168, 1181-1188, 8 L.Ed.2d 345 (1962); Brannan v. Stark, 342 U.S. at 466-484, 72 S.Ct. at 440-450, but which has never commanded a majority of the Supreme Court.
 
 
 30
 In the absence of any positive indication, in the form of amendments, that Congress has subsequently deemed it advisable to expand the Secretary's scope of discretion, it is of no consequence that a broader delegation would probably survive constitutional scrutiny today. See 1 K. Davis, Administrative Law Treatise Sec. 3:2 (2d ed. 1978). Nor have appellees directed our attention to any previous orders containing substantially similar provisions that might indicate congressional acquiescence in a consistent administrative interpretation of the Act. Cf. Brannan v. Stark, 342 U.S. at 466, 72 S.Ct. at 441.
 
 
 31
 The leading case interpreting Sec. 8c(7)(D), Brannan v. Stark, supra, lends support to this narrow construction. In that case the Secretary had amended an order to provide for special payments to cooperative associations for representational, educational, and informational services. These payments were funded through a deduction from the blended price paid to all producers. Under the purported authority of Sec. 8c(7)(D), the Secretary justified these payments as "remuneration for services performed for the market by the associations." 342 U.S. at 456-58, 72 S.Ct. at 436-37. The Court held that the payments were not a permissible "incidental" term. The Court noted at the outset of its analysis that "Sec. 8c(5) states in specific and lengthy detail the provisions which may be included in milk marketing orders. That subsection lays down comprehensive directions for classification, pricing, and the operation of the equalization pool mechanism, particularly as to adjustments and deductions employed in determining the blended price. But Sec. 8c(5) does not authorize the provisions challenged here." 342 U.S. at 462, 72 S.Ct. at 439. Section 8c(5) is equally detailed and specific about permissible adjustments to the class prices paid by handlers. Here, too, we have an adjustment that is not authorized by the "comprehensive directions" laid down in Sec. 8c(5).
 
 
 32
 Here, as in Brannan, "it is claimed that the contested provisions are of such basic importance that their validity may be crucial to the success of the whole milk marketing program." 342 U.S. at 462-63, 72 S.Ct. at 438-39. As the Court said in that case, "[w]e do not think it likely that Congress, in fashioning this intricate marketing order machinery, would thus hang one of the main gears on the tail pipe." 342 U.S. at 463, 72 S.Ct. at 439. The Brannan Court found further support for its conclusion in the fact that Sec. 8c(5)(E), 7 U.S.C. Sec. 608c(5)(E), specifically provides for deductions from producer payments for certain services performed by cooperatives, "indicating the likelihood of similar specific authorization for the contested deductions if Congress intended that they should be made." Id. Similarly, Secs. 8c(5)(B)(ii)(d)-(e) give specific authorization for mechanisms--"base-excess" plans and "Louisville" plans--to "encourage seasonal adjustments in the production of milk." 7 U.S.C. Secs. 608c(5)(B)(ii)(d)-(e). These mechanisms were intended "to eliminate, so far as possible, violent seasonal fluctuations in the available milk supply with their attendant disturbing effect upon returns to producers...." S.Rep. No. 1011, 74th Cong., 1st Sess. 11 (1935); H.R.Rep. No. 1241, 74th Cong., 1st Sess. 10 (1935); see also H.R.Rep. No. 1329, 91st Cong., 2d Sess. 18-19 (1970). This is precisely the problem the transportation credit at issue is designed to address. The fact that Congress has specifically provided certain mechanisms, in the form of production disincentives, for preventing seasonal surpluses would lead us to expect similar specific authorization if Congress intended that transportation credits be used to reduce the seasonal surplus of milk in a regulated market.
 
 
 33
 Appellees argue that Brannan is distinguishable. In Brannan the Court noted that the "services" for which the contested payments were made were "performed for the direct benefit of the cooperatives' memberships, [were] but incidentally helpful to other producers, and [were] not a required condition to receipt of the payments." 342 U.S. at 464, 72 S.Ct. at 440. Here, appellees contend, the credits were given only for services that were actually performed, and which redounded to the benefit of the entire market. As such, it is argued, the credits are permissible under Brannan. Appellees cite Grant v. Benson, 229 F.2d 765 (D.C.Cir.1955), cert. denied, 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 875 (1956), as a similar case adopting this view. We believe, however, that even if appellees' factual distinction is well-taken, it does not help their cause. The Court's observation in Brannan related to its finding that the payments were "inconsistent" with the uniform producer pricing scheme of Sec. 8c(5)(B); it was not the basis of the holding that the payments were not "incidental". Indeed, we do not see the relevance of the distinction appellees make to the question of whether the transportation credit is a permissible "incidental" term. Thus, we agree with Judge Prettyman, who--dissenting in Grant v. Benson, supra --said, "I do not overlook the contrast noted by the Court [in Brannan ] ..., but that notation seems to me not to affect the gist of the Court's opinion." 229 F.2d at 773.
 
 
 34
 Nor do we find any merit in appellees' contention that Zuber v. Allen, supra, authorizes the type of transportation credit at issue here. In Zuber the Court struck down a "nearby differential" that resulted in farmers situated close to certain market centers receiving a higher price for their milk. Appellees rely on dicta to the effect that "permissible adjustments are limited to compensation for rendering an economic service." 396 U.S. at 188, 90 S.Ct. at 325. The Court was referring, however, to Sec. 8c(5)(B)(ii)(a), which permits adjustments to the blended price for "volume, market, and production differentials customarily applied by the handlers subject to such order." 7 U.S.C. Sec. 608c(5)(B)(ii)(a). Thus, the Court's dicta is of no use in determining what constitutes a permissible "incidental" term under Sec. 8c(7)(D).
 
 
 35
 Our decision today is not intended to vitiate the residual authority granted to the Secretary by Sec. 8c(7)(D). The cases are replete with examples of terms that are authorized by this provision. See Lawson Milk Co. v. Freeman, 358 F.2d 647 (6th Cir.1966) (two-year limitation period on claims by handlers against the market administrator); General Ice Cream Corp. v. Benson, 113 F.Supp. 107 (N.D.N.Y.1953), aff'd, 217 F.2d 646 (2d Cir.1954) (30-day limitation period on claims for storage cream payments); see also Marchezak v. McKinley, 607 F.2d 37 (3d Cir.1979) (Gibbons, J., concurring) (requirement that certain handlers make their producer payments through the market administrator). A cursory glance at any milk marketing order reveals a myriad of terms and conditions necessary to solve the "patently difficult problems of auditing and policing," Kessel, supra, 10 J. Law & Econ. at 53, the Act's marketwide sharing mechanisms, but which have no specific basis in the language of the Act. We do not wish to imply that such provisions represent the outer limits of the Secretary's residual authority; nor do we intimate any "bright line" view as to what the limits of that authority are. We hold only that the transportation credit at issue clearly exceeded those limits.
 
 
 36
 As Judge Harold Leventhal once wrote in a similar context:
 
 
 37
 A court's deference to administrative expertise rises to zenith in connection with the intricate complex of regulation of milk marketing. Any court is chary lest its disarrangement of such a regulatory equilibrium reflect lack of judicial comprehension more than lack of executive authority. In this case, however, continued reflection and diligent study have strengthened rather than shaken our conclusion that the Secretary's order is an invalid departure from the statutory scheme established by Congress.
 
 
 38
 Blair v. Freeman, 370 F.2d 229, 232 (D.C.Cir.1966). If, as appellees contend, the Act as we construe it provides insufficient flexibility to meet exigent market situations, then "the industry must once more resort to Congress." Queensboro Farms Products v. Wickard, 137 F.2d at 983 (L. Hand, J., dissenting).
 
 CONCLUSION
 
 39
 For the foregoing reasons, the judgment of the district court will be reversed and the case remanded for proceedings consistent with this opinion.
 
 
 
 *
 Honorable Joseph L. McGlynn, Jr., United States District Court for the Eastern District of Pennsylvania, sitting by designation