The Honorable Johnny Hoyt State Representative 15 Country Lane Morrilton, Arkansas 72110
Dear Representative Hoyt:
I am writing in response to your request for an opinion on the constitutionality of House Bill 1419, which proposes the adoption of a new statutory subchapter entitled the "Arkansas Milk Stabilization Act."[1]
RESPONSE
Although you have not stated any particular grounds upon which the bill might be unconstitutional, it is my opinion that the bill is in all likelihood unconstitutional under the Supremacy Clause of the United States Constitution in light of its conflict with the federal regulatory scheme. It is therefore unnecessary to address whether it might also be unconstitutional under other constitutional provisions, including the dormant commerce clause.
House Bill 1419 is entitled "An Act to Create the Arkansas Milk Stabilization Act; to Protect the Arkansas Dairy Industry; and for other Purposes." A lengthy initial section of the bill states the findings and purposes of the General Assembly, including findings that dairy farms are an essential agricultural activity of the state; are an "integral part" of the state's economy and rural communities; that such farms "preserve land for agricultural purposes" and "provide needed economic stimuli for rural communities." The bill also states that the ability of dairy farms and associated marketers to "provide a stable, local supply of pure and wholesome milk is a matter of great importance to the health and welfare of the people of this state." Section 1, proposed section 2-32-302. The bill also states that "[r]ecent, dramatic price fluctuations, with a pronounced downward trend, threaten the viability and stability of the dairy industry of this state. . . ." Id. at subsection (a)(7). This same section states that the "federal order system, implemented by the Agricultural Marketing Agreement Act of 1937, established only minimum prices paid to producers for raw milk, without preempting the *Page 2 
power of the state to regulate milk prices above the minimum levels so established." Id. at subsection (a)(8). The bill therefore states its purposes to "[t]ake all steps necessary to assure the continued viability of dairy farming in the state," "assure consumers of an adequate, local supply of milk," "neither displace the federal order system nor encourage the merging of federal orders," to establish equitable pricing for Arkansas-produced milk and encourage increased production to meet the state's need for quality milk.
The pertinent substantive provisions of the bill state as follows:
 (a) The Arkansas Milk Stabilization Act is created to exercise the state's right under the Federal Milk Marketing Order to institute a state-regulated milk pricing plan for milk produced in this state.
 (b) For a dairy cooperative that transports milk from farm to processor and distributes milk-sales dollars back to the dairy farmer and any other entity that markets milk directly from a dairy farmer:
 (1) All milk produced under Grade A regulations and that meets the processor's requirements for Class 1 Milk shall be priced in the Class 1 Value for milk as stated by the Federal Milk Market administrator on January 1, 2007, for orders that affect Arkansas produced milk; and
 (2)(A) Handler costs shall be no more that thirty-five cents (35¢ ) per hundredweight excluding transportation costs. *Page 3 
 (B) Transportation costs paid by an Arkansas dairy farmer shall be limited to usual and customary costs of transporting Arkansas milk to processors in this state.
The bill also provides that the "Act shall be under the jurisdiction and administration of the Arkansas Livestock and Poultry Commission."Id. at proposed section 2-32-304.
You have asked in a very general fashion whether the provisions of this bill are constitutional. It is impossible in the limited format of an Attorney General's opinion and within the time constraints necessarily attendant the pending legislative session, to comprehensively address every potential constitutional issue that might be brought by a potential litigant challenging this bill. For purposes of expediency, and because in my opinion this bill is likely unconstitutional under the Supremacy Clause, I will limit my discussion to that issue.
Milk Pricing
As an initial matter, some explanation of milk economics and the federal regulatory system is necessary in order to provide a backdrop for the Supremacy Clause discussion. It has been stated, with regard to "milk economics" that:
 On the surface, the path of milk from the cow to the consumer seems simple. A farmer (commonly called a "producer") sells raw milk to a processor (or "handler"). The handler processes the raw milk into fluid milk or other dairy products, packages it, and sells the product to a retailer. The retailer, in turn, sells to the consumer.
 Yet this apparent simplicity is deceptive. Federal and state regulations regarding the sale of milk make "Byzantine" an apt, and none too pejorative, description. See, e.g., Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1344 (6th Cir.1994) ("[T]he system established by [federal law] to regulate the sale of milk is of labyrinthine complexity."); Kenneth W. Bailey, Marketing and Pricing of Milk and Dairy Products in the United States 109 (1997) (noting that the rules governing milk prices are *Page 4 
"mindboggling"); Jim Chen, Around the World in Eighty Centiliters, 15 Minn. J. Int'l L. 1, 6 (2006) (describing the federal milk pricing structure as "outlandishly complex"). This complexity, and the large sums of money at stake, have spawned an extraordinary amount of litigation. It has been estimated that "no other commodity in the United States has been involved in as many legal challenges in regard to how it is marketed" as milk. Bailey, supra, at 3.
Cloverland-Green Spring Dairies, Inc., v. Pennsylvania Milk MarketingBoard, 462 F.3d 249 (3rd Cir. 2006) at 252.
With regard to the marketing of milk, the Cloverland-Green SpringsDairies court stated the following:
 Milk is a unique agricultural commodity. The Supreme Court has recognized "two distinctive and essential phenomena of the milk industry[:] a basic two-price structure that permits a higher return for the same product, depending on its ultimate use, and the cyclical characteristic of production." Zuber v. Allen, 396 U.S. 168, 172, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); see also Lehigh Valley Farmers v. Block, 829 F.2d 409, 411
(3d Cir.1987) (same). The first phenomenon derives from the fact that raw milk may be put to two general uses by handlers: fluid milk for drinking and manufactured dairy products such as cheese, butter, and ice cream. See Zuber, 396 U.S. at 172, 90 S.Ct. 314. Fluid milk is more expensive for handlers to produce and market because it is highly perishable (a gallon of milk must ordinarily be marketed to the consumer within two days of milking), requires more sanitation and processing than other dairy products, and is heavier and thus more expensive to transport. See id. at 173 n. 3, 90 S.Ct. 314; Bailey, supra, at 34, 46, 109-10; Alden C. Manchester Don P. Blayney, Econ. Research Serv., U.S. Dep't of Agric., Milk Pricing in the United States 2 (2001), available at http://www.ers.usda.gov/publications/aib761/aib761.pdf. Fluid milk for drinking therefore costs the consumer more per pound than milk that has been manufactured into other dairy products, and the partial inelasticity of demand for fluid milk (viewed as a dietary staple by many Americans) means profit margins on fluid *Page 5 
milk sales may also be higher. See Bailey, supra, at 34; see also Smyser v. Block, 760 F.2d 514, 516 (3d Cir.1985) ("Milk that is ultimately used for fluid purposes has traditionally commanded a higher price than milk of the same grade and quality used for manufactured products. This difference is not entirely accounted for by differences in cost.").
 Farmers also produce two "grades" of marketable raw milk. Grade A milk is fit for drinking, and therefore can be processed into fluid milk or manufactured products, while Grade B milk is not fit for drinking but may be used in other dairy products. Manchester Blayney, supra, at 2; David L. Baumer, Federal Regulation of Milk Production and Sale is Growing at the Expense of State Authority, 12 J. Agric. Tax. L. 36, 38-39 (1990). Not surprisingly, in an entirely unregulated market, handlers would have an incentive to produce manufactured dairy products using Grade B milk and reserve as much Grade A milk as possible for the more lucrative fluid milk market. At the same time, farmers would want to be paid a higher price for their Grade A milk than for Grade B milk, but handlers would want to pay less for Grade A milk they intended to put to use in manufactured dairy products (i.e., surplus Grade A milk they cannot sell as fluid milk).
 The complexity deepens when we consider the second phenomenon identified in Zuber: the cyclical nature of milk production. Demand for fluid milk, though somewhat inelastic with respect to price, is temporally cyclic, with demand higher in the fall and winter months than in the spring and summer months. See Zuber, 396 U.S. at 172-73, 90 S.Ct. 314; Bailey, supra, at 34; see also John R. Snyder, A Summary: Political and Economic Analysis of Milk Marketing, 1980-81 Agric. L.J. 297, 310-11. Unfortunately, cows do not work this way, and produce more milk in the spring and summer (known as the "flush" season) than in the fall and winter (the "short-supply" season). Manchester Blayney, supra, at 2; Snyder, supra, at 310-11. Thus, "it [is] necessary to coordinate a supply that is rising when fluid milk demand is falling." Manchester Blayney, supra, at 2. Otherwise, handlers would attempt to "take advantage of this *Page 6 
surplus to obtain bargains [from producers] during glut periods," which would lead farmers to increase production to maintain a steady income, "and the disequilibrium snowballs." Zuber, 396 U.S. at 173, 90 S.Ct. 314; Smyser, 760 F.2d at 516 ("In an unregulated market `cutthroat' competition for more profitable fluid milk sales can lead to an overall decline in prices."); see also Bailey, supra, at 110 (explaining that the unique characteristics of the milk industry, if unregulated, lead to "chaotic marketing conditions").
Id. at 252-253.
With regard to federal regulation of milk pricing, the Third Circuit explained that "Federal regulation of the nation's dairy industry began in earnest in the 1930s, when falling prices caused by the Great Depression led to "utter chaos" in the milk market. Zuber,396 U.S. at 174,90 S.Ct. 314." Id. at 253-54. Current federal regulation, as House Bill 1419 notes, is through the "Agricultural Marketing Agreement Act ("AMAA") of 1937. See 7 U.S.C. § 608c. With regard to the actual operation of the federal system, the Third Circuit stated:
 Under the AMAA, the Secretary of Agriculture is empowered to regulate the nation's milk markets by issuing "orders" that regulate prices in defined geographic areas. See 7 U.S.C. § 608c(1); Defiance, 857 F.2d at 1067; Lehigh Valley, 829 F.2d at 411. These orders are meant to ensure "a sufficient quantity of pure and wholesome milk to meet current needs and further to assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs," 7 U.S.C. § 608c(18). Although their number has varied over the years, there are currently ten federal milk marketing order areas. See 7 C.F.R. pts. 1001-1135; U.S. Dep't of Agric., Consolidated Milk Marketing Order Areas, available at http://www.ams.usda.gov/dairy/dymap.htm. Within these orders, the Secretary sets prices at which raw milk may be sold. There are two main features of this pricing structure that merit explanation.
 Handlers pay for their milk according to a classified pricing arrangement. See 7 U.S.C. § 608c(5)(A). Grade A raw milk is classified according to its end use. Class I milk is *Page 7 
fluid milk for drinking, while other classes (II, III, and IV) are assigned to raw milk used in various manufactured products. 7 C.F.R. § 1000.40; see West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 189 n. 1, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) . . . handlers pay more for Grade A raw milk they intend to put to use as Class I milk than they do for Grade A raw milk they intend to put to use as Class II, III, or IV milk. See Lansing Dairy, 39 F.3d at 1344; Smyser, 760 F.2d at 516.
 Producers do not, however, receive more or less money for raw milk based on the handler's use. Instead, producers receive a uniform "blend" price that is essentially a weighted average of the price of all classes of milk sold in the region. See 7 U.S.C. 608c(5)(B); Zuber, 396 U.S. at 177, 90 S.Ct. 314; Lehigh Valley, 829 F.2d at 411. This system "eliminate[s] the potential situation where one producer, who sold milk to a fluid processor, would get a higher milk price than his neighbor who sold to a cheese plant." Bailey, supra, at 113; see also Lehigh Valley, 829 F.2d at 411-12 ("By mandating that producers within a market area receive a uniform price based on the use of milk within the area, the [AMAA] eliminates the incentive for dairy farmers to attempt to compete with their neighbors through lowering their prices."). Of course, this would ordinarily lead to a situation in which handlers dealing mostly in lower classes of milk essentially subsidize those dealing mostly in Class I milk, because the blend price paid to the producer will be more than, say, the classified price of Class IV milk, but lower than the classified price of Class I milk. To compensate for this, the regulations establish a "Producer Settlement Fund," into which handlers who have underpaid contribute an amount equal to the difference between the blend price and classified price, which is then distributed to handlers who have overpaid. See 7 C.F.R. § 1000.70; Lansing Dairy, 39 F.3d at 1344; Smyser, 760 F.2d at 516.
 By charging handlers less for Grade A raw milk used in storable dairy products like cheese and butter than for raw milk used as Class I drinking milk, while assuring that producers are paid the same no matter the use to which the raw milk is put, handlers *Page 8 
have an incentive to use surplus Grade A milk in manufactured products during the glut months, and producers maintain a more stable income year-round. This, in turn, guards against overproduction in the flush season. Moreover, the Producer Settlement Fund relieves pressures on handlers to deal exclusively in fluid milk to the detriment of other dairy products.
Id. at 254-255.
The State of Arkansas is in the "Southeast Marketing Area." "Part 1007.2" Federal Order Regulating Handling, available atwww.ams.usda.gov/fmor/southeast.
The Supremacy Clause
"Under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, state laws that `interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." Wisconsin Public Intervenorv. Mortier, 501 U.S. 597, 604 (1991). As explained by the First Circuit three-judge panel in Grant's Dairy v. Maine Department of Agriculture,Food Rural Resources, 232 F.3d 8 91st Cir. 2000), federal preemption may be express or implied.
"Express preemption occurs only when a federal statute explicitly confirms Congress's intention to preempt state law and defines the extent of that preclusion." 232 F.3d at 13. There is no express preemption in the federal regulatory scheme related to milk pricing.
"Implied preemption can occur in one of two ways: field preemption or conflict preemption. . . . Field preemption occurs when a federal regulatory scheme is so pervasive as to warrant an inference that Congress did not intend the states to supplement it." Id. at 13-14,citing Gade v. National Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98,120 L. Ed. 2d 73, 112 S. Ct. 2374 (1992). It has been stated that ". . . the great weight of authority holds that state regulation of milk prices is not preempted by the extant federal regime." Grants Dairy v. MaineDepartment of Agriculture, Food Rural Resources, supra, citingCrane v. Commissioner of Dep't of Agric., Food Rural Res.,602 F. Supp. 280, 293 (D. Me. 1985); Schwegmann Bros. Giant Super Mkts. v.Louisiana Milk Comm'n, 365 F. Supp. 1144, 1156-57 (M.D. La. 1973),aff'd, 416 U.S. 922, 40 L. Ed. 2d 279, 94 S. Ct. 1920 (1974); UnitedDairy Farmers Coop. Ass'n v. Milk Control Comm'n, 335 F. Supp. 1008,1014-15 (M.D. Pa. 1971), aff'd, 404 U.S. 930, 30 L. Ed. 2d 244, *Page 9 92 S. Ct. 280 (1971);Medo-Bel Creamery, Inc. v. Oregon, 65 Ore. App. 614, 673
P.2d 537, 544 (Or.Ct.App. 1983). See also, Schwegmann Bros. G.S. Mktsv. Louisiana Milk Com'n, 200 So.2d 37 (La App 1967); In Re E.J. McGovernDairy Products, Inc., 31 N.J. 601, 158 A.2d 689 (1960); andBrookwood Farms v. Milk Marketing Board, 304 A.2d 510, 8 Pa. Cmwlth. Ct 511, 304 A.2d 510 (1973).
As stated in Wisconsin Public Intervenor v. Mortier, supra,however, "[e]ven when Congress has not chosen to occupy a particular field, preemption may occur to the extent that state and federal law actually conflict. Such a conflict arises when `compliance with both federal and state regulations is a physical impossibility,' Florida Lime Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963), or when a state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' Hines v. Davidowitz,312 U.S. 52 (1941)." Id. at 605. It is on this basis that House Bill 1419 violates the Supremacy Clause, in my opinion.
House Bill 1419 requires all milk produced under Grade A regulations and that meets the processor's requirements for Class 1 Milk to be priced in the "Class 1 Value." This provision ensures a uniform price to be received by all producers, a fact seemingly consistent with the federal regime, which also requires a uniform price ultimately paid to producers. See 7 U.S.C. § 608c(B). Unlike the federal regime, however, the bill does not "classify milk in accordance with the form in which or the purpose for which it is used, and fix . . . minimum prices for each such use classification which all handlers shall pay. . . ."See 7 U.S.C. 608c. Instead, it fixes one price to be paid by handlers for Grade A Class 1 acceptable milk notwithstanding the use to which the milk will be put. In essence, House Bill 1419 is contrary to the federal scheme, in my opinion, because it does not utilize any type of "blended pricing" mechanism.
As noted by the court in Cloverland-Green Spring Dairies, supra, the blended pricing mechanism, including "charging handlers less for Grade A raw milk used in storable dairy products like cheese and butter than for raw milk used as Class I drinking milk while assuring that producers are paid the same no matter the use to which the raw milk is put" gives handlers an incentive "to use surplus Grade A milk in manufactured products during the glut months, thus giving producers a more stable income year-round." Id. at 255. "This, in turn, guards against overproduction in the flush season." Id. at 255. "Moreover, the Producer Settlement Fund relieves pressures on handlers to deal exclusively in fluid milk to the detriment of other dairy products." Id. at 255. *Page 10 
Without some form of blended pricing, the evils attendant the "cutthroat competition" due to the multiple uses of milk and the seasonal nature of milk supply and demand are not addressed. If handlers are required to pay the Class 1 price irrespective of what use they are to put the milk, they will have an incentive to use the milk only for "fluid" milk, which is more profitable. As a result, they will endeavor to use all Class 1 milk for fluid milk even when there is a glut in the supply. As noted above by the Third Circuit, this "`cutthroat' competition for more profitable fluid milk sales can lead to an overall decline in prices."Id. at 253.
In my opinion, therefore, the provisions of House bill 1419 are "conflict preempted" by the relevant federal regulatory scheme. Under HB 1419, compliance with the extant federal order is impossible and the objectives of the federal scheme would be undermined. See Federal Order at 1007.51, setting the Class 1 Price and the "Class 1 "differential;" and 1007.60, 1007.61 and 1007.70 (establishing the calculation for the handler's value of milk, the uniform price and the producer's settlement fund). Cf. also Pearce v. Freeman, 238 F. Supp. 947 (E.D. La 1965) (striking down Louisiana law under preemption theory because it required handlers to pay producers a blend price determined by each individual handlers' actual milk usage, rather than on the federal regulations requiring a blend price based on market-wide averages of handler milk usage) .
It is true that a number of other states set state minimum prices that are over the federal order price. In setting these so-called "over-order" minimums, however, it appears that the states have continued to utilize some form of blending pricing and something akin to a producer settlement fund. See, e.g., Cloverland-Green Dairies, supraand United Dairy Farmers Cooperative Association v. Milk ControlCommission, 335 F.Supp. 1008 (M.D. Pa. 1971), (Pennsylvania); GrantsDairy, supra and Crane v. Commissioner of Department ofAgriculture, 602 F.Supp. 280 (D. Me 1985), aff'd 404 U.S. 930 (1971), (Maine), Hinshaw v. Beatrice Foods, unreported Fed. Dist. Ct (D. Montana), 1980 WL 1931, (Montana); See however, Schwegmann Bros. GiantSuper Mkts. v. Louisiana Milk Comm'n, 365 F. Supp. 1144, 1156-57 (M.D. La. 1973), aff'd, 416 U.S. 922, 40 L. Ed. 2d 279, 94 S.Ct. 1920 (1974) (upholding a Louisiana minimum pricing scheme, which apparently did not involve blended pricing, where plaintiff did not attempt to show any actual conflict with federal statutes or policy). *Page 11 
In my opinion, therefore, although the relevant law is complex and a full analysis would require an elaborate factual review, House bill 1419 is in all likelihood unconstitutional under the Supremacy Clause.
Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] A separate bill is also pending, House Bill 2390, to add a subchapter entitled the "Arkansas Milk Stabilization Board Act." *Page 1