829 F.2d 409
 LEHIGH VALLEY FARMERS, Atlantic Processing, Inc., Dairylea
Cooperative, Inc., Mount Joy Farmers Cooperative, Monroe
County Milk Producers Cooperative, Ruth, Alpheus; Gehman,
Robert; Hetrick, Roy; Hartung, Richard; Hafer, Earl R.,
on Behalf of himself and the members of the Berks County
Dairy Farmers Protective Association, and Hollenbach, Carl
and Carolyn on Behalf of themselves and the members of Berks
County Dairy Farmers Protective Association
v.
BLOCK, John R.; Pennmarva Dairymen's Cooperative
Federation, Inc. & the Individual Members Thereof
(Intervenors), Eastern Milk Producers Cooperative Assoc.
Inc. & Group of Private Independently Owned Proprietary
Handlers (Intervenors).
Appeal of John R. BLOCK, Secretary of Agriculture.
FARMERS' COOPERATIVE DAIRY INC.; Spiece, Guy E.; Cook,
Donald L.; Drasher, A. Charles; Hilliard, Foster E., Jr.;
Mylet, Andrew M.; Travelpiece, Luther R.; and Yoder,
Samuel A., on Behalf of themselves and all members of
Farmers' Cooperative Dairy, Inc.; Leatherman, John; Rhein,
Dawn F.; Heisler Bros.; Leatherman, Bruce; Martin,
Ronald; Hollenbach, Carl; Brown, Carl; Hefner, Ralph t/a
Jersey Acres Farms; Kurtz, Harry; Wolf, Marvin; Moyer,
Wilbert; Daubert, William R.; Petravich, Alvin; Moyer,
Lester; Leiby, Bertram; Heisler, Carl; Heisler, Paul;
Schnoke, Samuel; Huber, Robert; Moyer, Amos, Jr.;
Kreager, Kenneth; Cuers Dairy, Inc.; and Valley Farms, Inc.
v.
BLOCK, John R.; Pennmarva Dairymen's Cooperative
Federation, Inc. (Intervenor), Eastern Milk Producers
Cooperative Assoc. Inc. & Group of Private Independently
Owned Proprietary Handlers (Intervenors).
Appeal of John R. BLOCK, Secretary of Agriculture.
LEHIGH VALLEY FARMERS, Atlantic Processing, Inc., Dairylea
Cooperative, Inc., Mount Joy Farmers Cooperative, Monroe
County Milk Producers Cooperative, Ruth, Alpheus; Gehman,
Robert; Hetrick, Roy; Hartung, Richard; Hafer, Earl R.,
on behalf of himself and the members of the Berks County
Dairy Farmers Protective Association, and Hollenbach, Carl
and Carolyn, on Behalf of themselves and the members of
Berks County Dairy Farmers Protective Association
v.
BLOCK, John R.; Pennmarva Dairymen's Cooperative
Federation, Inc. & the Individual Members Thereof
(Intervenors), Eastern Milk Producers Cooperative Assoc.
Inc. & Group of Private Independently Owned Proprietary
Handlers (Intervenors).
Appeal of STOCKER BROTHERS DAIRY, Proposed Intervenor.
 Nos. 86-1592, 86-1593 and 86-1633.
 United States Court of Appeals,
Third Circuit.
 Argued June 15, 1987.
Decided Sept. 21, 1987.
 
 Edward S.G. Dennis, Jr., U.S. Atty., Joan K. Garner, Asst. U.S. Atty., Philadelphia, Pa., James Michael Kelly, Associate General Counsel, Raymond W. Fullerton, Asst. General Counsel, Aaron B. Kahn (argued), Office of General Counsel, U.S. Dept. of Agriculture, Washington, D.C., for appellant Secretary of Agriculture.
 Roland Morris, Duane, Morris & Heckscher, Philadelphia, Pa., for intervenor Handlers.
 Donald F. Copeland, Donald F. Copeland, P.C., Norristown, Pa., for intervenor Pennmarva Dairymen's Federation, Inc.
 J. Jackson Eaton (argued), Gross, McGinley, LaBarre & Eaton, Allentown, Pa., appellees in 86-1592 and appellant Stocker Bros. Dairy.
 Marvin Beshore (argued), Milspaw & Beshore, Harrisburg, Pa., for appellees in 86-1593.
 Before SEITZ and MANSMANN, Circuit Judges, and DEBEVOISE,* District Judge.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 The Secretary of the Department of Agriculture appeals the order of the district court enjoining him from implementing amendments to the Middle Atlantic (Order 4) and New York-New Jersey (Order 2) Milk Marketing Orders that would expand the area regulated by the two orders. Stocker Brothers Dairy appeals the denial of its motion to intervene as a plaintiff. This court has jurisdiction pursuant to 28 U.S.C. Sec. 1291 (1982).
 
 I.
 
 2
 To understand this case, it will be helpful to describe briefly the federal regulatory scheme for the marketing of milk. The marketing of milk has taken place in large measure under the aegis of federal control since the 1930s. During the Depression, dairy farmers engaged in fierce competition and "utter chaos" in the dairy industry ensued. See Zuber v. Allen, 396 U.S. 168, 172-74, 90 S.Ct. 314, 317-18, 24 L.Ed.2d 345 (1969). In an effort to bring this destabilizing competition under control, Congress authorized the Secretary of Agriculture to issue milk marketing orders that establish a uniform price to be paid to producers (dairy farmers) by handlers (those who manufacture raw milk into bottled milk and other products) in the Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. Sec. 601 et seq. (1937) (the Act). The purposes of the Act are to maintain orderly marketing conditions that will result in parity prices for farmers and will protect consumers. See 7 U.S.C. Sec. 602 (1982).
 
 
 3
 The complex federal regulations governing the milk industry are designed to address two distinct phenomena of the industry. First, cows produce significantly more milk in the spring and summer than they do in the fall and winter. Because the demand for milk is relatively constant, dairy farmers must maintain sufficient herds to meet the fall and winter demand for milk. Thus, there is inevitably a surplus of milk during the more productive months. Second, milk that is ultimately used for fluid consumption by consumers (Class I milk) commands a higher price than milk of the same quality that is used in the manufacture of dairy products such as cheese and butter (Class II milk). In the absence of regulation, the intense competition by dairy farmers for the more lucrative fluid sales market can lead to depressed prices and unstable markets. See Zuber v. Allen, supra, 396 U.S. at 172-74, 180-81, 90 S.Ct. at 317-18, 321-22; Smyser v. Block, 760 F.2d 514, 515-16 (3d Cir.1985).
 
 
 4
 To prevent such disorderly marketing conditions, the Act authorizes the Secretary to issue orders providing for "all producers in a regional market [to] share equally in the burden created by surplus milk." See Smyser v. Block, supra, 760 F.2d at 516. The orders generally accomplish this goal by requiring the marketwide pooling of milk.[1] The orders classify milk as Class I or Class II milk according to its use and set minimum prices that the handlers must pay for each class.
 
 
 5
 Producers receive a uniform price, "the blended price," for all their milk regardless of the ultimate use of the milk. 7 U.S.C. Sec. 608c(5)(B) (1982). The blended price is based on a weighted average value of all milk sold within the marketing area regulated by a federal order. By mandating that producers within a market area receive a uniform price based on the use of milk within the area, the Act eliminates the incentive for dairy farmers to attempt to compete with their neighbors through lowering their prices.
 
 
 6
 To account for the difference between what the handlers pay and what the producers receive, the orders establish producer settlement funds. Handlers who supply more fluid milk than the average utilization for the area regulated by a federal order, and therefore have a higher "use value" than the blended price, must contribute to the fund. Conversely, those handlers whose "use value" is less than the blended price receive the difference from the fund.
 
 
 7
 This case involves the Secretary's decision to expand the areas covered by the Middle Atlantic (Order 4) and New York-New Jersey (Order 2) Milk Marketing Orders to include twenty counties in Pennsylvania that are not currently regulated by the federal government.[2] The Secretary declined to extend the two orders to regulate these Pennsylvania counties in 1975. 40 Fed.Reg. 14702 (1975). In 1983, however, the Secretary announced that he would again hold hearings on whether the twenty counties should be included in the market covered by Order 2 and Order 4. 48 Fed.Reg. 28655 (1983). The proposal to add the counties was supported by producers under Order 4 and a number of the handlers regulated by Order 4 and Order 2.
 
 
 8
 After twenty four days of hearings, the Secretary issued his decision that the nonfederally regulated counties should be added to the area regulated by the two federal orders. See 50 Fed.Reg. 32716 (1985).[3] A number of dairy farmers and cooperatives from the nonregulated handlers filed this action in district court pursuant to 7 U.S.C. Sec. 608c(15)(B), seeking a preliminary injunction against the implementation of the amendments. The district court entered the preliminary injunction against the Secretary following a four-day hearing.
 
 
 9
 The district court thereafter granted the plaintiffs' request for a permanent injunction prohibiting the Secretary from implementing the amendments on the ground that the Secretary's decision to expand the area regulated under Order 2 and Order 4 was not supported by substantial evidence. See Lehigh Valley Farmers v. Block, 640 F.Supp. 1497 (E.D.Pa.1986). In addition, the court denied the motion of three handlers to intervene on the plaintiffs' behalf because the handlers had not exhausted their administrative remedies as required by United States v. Ruzicka, 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290 (1946). These appeals followed.
 
 II.
 
 10
 The Secretary challenges the district court's conclusion that the decision to add the twenty counties to Order 2 and Order 4 marketing areas was not supported by substantial evidence on the record. Our review of the Secretary's decision is limited to whether the decision is supported by substantial evidence and is in accordance with the law. See Suntex Dairy v. Block, 666 F.2d 158, 162 (5th Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 59, 74 L.Ed.2d 62 (1982); Lewes Dairy, Inc. v. Freeman, 401 F.2d 308, 315 (3d Cir.1968), cert. denied sub nom. Lewes Dairy, Inc. v. Hardin, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969). The Secretary's decision thus must be upheld if the record contains "such relevant evidence as a reasonable mind might accept as adequate to support [the agency's] conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).
 
 
 11
 Under the Act, the Secretary is authorized to issue an order if, after a hearing, he concludes the issuance of the order will "tend to effectuate the declared policy" of the statute. 7 U.S.C. Sec. 608c(4). The terms and conditions that an order may contain are limited to those provided by statute. 7 U.S.C. Sec. 608c(5), (7). The Act, however, provides little, if any, guidance as to the definition of what constitutes a regional marketing area.
 
 
 12
 The Supreme Court in United States v. Rock Royal Cooperative, 307 U.S. 533, 576, 59 S.Ct. 993, 1014, 83 L.Ed. 1446 (1939), concluded that the Act "authorizes a marketing agreement and order to be issued for such production or marketing regions or areas as are practicable." Consistent with this limit of practicability, two Courts of Appeals have upheld the Secretary's decisions to expand the area regulated by a federal order when the record showed that proposed area was characterized by "intermarket competition in distribution, common production areas and a common reserve supply." See Suntex Dairy v. Block, supra, 666 F.2d at 162; United States v. Mills, 315 F.2d 828, 835 (4th Cir.), cert. denied sub nom. Mills v. Freeman, 375 U.S. 819, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963) (the proposed area "was a practical homogeneous territory of control, fairly encompassing the Baltimore milkshed").
 
 
 13
 As noted above, the Secretary declined to extend Order 2 and Order 4 marketing areas to the nonfederally regulated area in 1975. 40 Fed.Reg. 14702 (1975). The Secretary found that most of the dairy farmers in the nonfederally regulated areas supplied Order 2 and Order 4 handlers. 40 Fed.Reg. at 14707-708. In addition, the Class I prices set by the Pennsylvania Milk Marketing Board (the PMMB) were substantially below federal order prices, and thus, nonfederally regulated handlers were able to secure their supply of milk at a lesser cost than were the federal handlers. Id. at 14709.[4]
 
 
 14
 Despite the price differentials and the common production areas, however, the Secretary declined to add the twenty counties to the Order 2 and Order 4 marketing areas. First, the Secretary found that Order 2 and Order 4 handlers were not substantially engaged in the distribution of fluid milk in the nonfederally regulated area. Second, he concluded that there was no evidence to support the contention that Order 2 handlers had lost sales because of a competitive disadvantage. Finally, the Secretary refused to enlarge the federal orders because the action would not perceptibly improve the condition of the producers either under federal order or in the nonregulated areas. Id. at 14709-10.
 
 
 15
 The Secretary distinguished the 1975 decision in his 1985 decision on the ground that the record indicated a "significantly different situation" from what existed in 1975. 50 Fed.Reg. at 32722. The Secretary, of course, must be free to react to changes in market conditions to effectuate the purposes of the statute. Cf. Suntex Dairy v. Block, supra, 666 F.2d at 162-63 (decision of the Secretary to merge six federal order areas into one federal order supported by evidence of change in marketing conditions). At the same time, when an agency changes its mind, "it must supply adequate data and a reasoned analysis to support the change." See National Resources Defense Council Inc. v. United States E.P.A., 790 F.2d 289, 298 (3d Cir.1986), cert. denied sub nom. Chemical Manufacturers Assn. v. National Resources Defense Council Inc., --- U.S. ----, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987). Simply asserting that conditions have changed will not support a change in the agency's position without a showing that the assertion is supported by substantial evidence in the record.
 
 
 16
 One of the reasons given by the Secretary for adding the twenty counties to the areas regulated under the federal orders is that the producers under the federal order were bearing the burden of the excess milk produced in the unregulated area. See 50 Fed.Reg. at 32721-23. The Secretary's allegation that the federal order producers are bearing the burden of the excess milk consists of two subsidiary findings. First, the Secretary concluded that Atlantic Processing, Inc. (API), a handler, dumped the excess milk from its nonregulated plant, the Schuylkill Haven plant, into the Order 4 pool by diverting the excess to its Allentown plant, which processes Class II milk under Order 4. In his decision, the Secretary stated that API diverts a "large portion" of its excess milk to the Allentown plant, which "lowers the uniform prices to those Order 4 producers who regularly supply the market." Id. at 32721.
 
 
 17
 As the district court demonstrated in its opinion, however, there is no substantial evidence in the record to support this conclusion. 640 F.Supp. at 1504-06. Although one witness alleged that API is shifting the excess milk to the Allentown plant, the witness was unable to provide any specific examples of such actions. Moreover, API's witness explained that only a "minute quantity," less than one percent of the Schuylkill Haven plant's total receipts, are diverted to the Allentown plant.
 
 
 18
 The Secretary also concluded that the nonfederally regulated handlers at times laid off producers in order to maintain a high Class I utilization rate, and that the producers then turned to handlers under federal orders to sell their milk. According to the Secretary, this served as a further example of the federal order producers carrying the burden of the excess milk. 50 Fed.Reg. at 32721-22. Once again, however, there is no substantial evidence in the record to support the Secretary's allegation. First, the Secretary admitted in his decision that the record does not demonstrate where the laid off dairy farmers now deliver their milk. Second, the record contains evidence of only one instance in which a dairy farmer turned to a federally regulated handler. The experts testifying that this movement occurred provided only generalized statements to this effect. Indeed, one expert stated that he was simply "raising the possibility" that such movement could occur. See 640 F.Supp. at 1507-09.
 
 
 19
 Mere speculation is not sufficient to support an agency's findings. We thus conclude that the district court was correct in finding that the Secretary's conclusion that the federal order producers were bearing the burden of the surplus milk is not supported by substantial evidence.
 
 
 20
 The Secretary also found that the addition of the counties was justified because API had a raw cost advantage over the federally regulated handlers. There is no question that API had a cost advantage over the federally regulated handlers. This cost advantage is a result of the interplay of the federal order regulations and the regulations of the PMMB. The API Schuylkill Haven plant is a temporary Order 2 plant, and its sales within the Order 2 market are thus pooled under the order. Because of a "pass through" provision in Order 2, however, the milk distributed by the Schuylkill Haven plant outside the Order 2 market is not subject to the pricing provisions of the federal order. Moreover, because API was a cooperative, it was not subject to the minimum pricing orders of the PMMB either. Thus, API had a raw cost advantage of approximately $2.3 million per year.[5]
 
 
 21
 As the district court stated, however, there is no evidence in the record that API uses this price advantage to the competitive detriment of the federally regulated handlers. 640 F.Supp. at 1511-12. The only evidence that the federally regulated handlers are operating at a competitive disadvantage in the unregulated area is the assertion that their sales are not "commensurate" with their size. 50 Fed.Reg. at 32720. The proponents of the expansion were unable to identify any instance in which a federally regulated handler lost sales because of the alleged competitive advantage. The Secretary's finding that API's raw cost advantage disadvantages the federal handlers in the unregulated area is therefore not supported by substantial evidence.
 
 
 22
 In his decision, the Secretary relied on the sales of API to demonstrate that handlers under federal order had substantial sales in the nonfederally regulated area. As noted above, however, API's sales in the nonregulated areas are not priced under the federal order. The Secretary's decision thus contains contradictory treatment of API: on the one hand, it treats API as though it were in competition with the federal handlers and on the other, it wishes to characterize API as a federal handler.
 
 
 23
 If API's sales in the nonfederally regulated areas are excluded, the federal order handlers distribute only five percent of the fluid milk sales in PMMB Area 3, which the Secretary proposed be added to Order 2, and only twenty five percent of the sales in PMMB Area 2, which was to be added to Order 4. See 640 F.Supp. at 1514. These figures are virtually identical to those before the Secretary in 1975 when he concluded that handlers under Order 2 and Order 4 did not have substantial sales in the proposed expansion area. See 40 Fed. at 14709-10.
 
 
 24
 On appeal, the Secretary relies heavily on his findings that the producers that are not federally regulated receive a higher blend price and that there are overlapping procurement areas to support his decision. The price differential, however, was even greater in 1975, as the Secretary recognized in his 1985 decision. 50 Fed.Reg. at 32722. In the 1975 decision, the Secretary explained that the price disparity "does not indicate that all nonfederally regulated areas of Pennsylvania should be included in a Federal order." 40 Fed.Reg. at 14704. Moreover, the overlap in production of milk also existed in 1975. The Secretary offers no explanation as to why these factors are more important in 1985 than they were in 1975.
 
 
 25
 Finally, the record evidence demonstrates that the blended price that nonfederally regulated producers would receive would decline substantially if the federal orders were expanded. 50 Fed.Reg. at 32723. Further, the increase in the blended price for producers currently under federal orders would be minimal because of the large number of producers under the orders. The Secretary dismissed the significance of this decline, stating that all dairy farmers should share in the Class I sales in the market. In 1975, however, one of the main reasons stated by the Secretary for refusing to extend the orders was that "extension of regulation to this area would not result in any perceptible improvement in returns to [the nonregulated] dairy farmers and would not materially affect prices under the orders." 40 Fed.Reg. at 14710. The Secretary again offers no rationale for the apparent change in emphasis between 1975 and 1985.
 
 
 26
 The Secretary argues that he is not required under the Act to find more than that the expansion of the federal orders would tend to support the goals of the statute. We agree with this statement of the Secretary's powers. At the same time, however, "[t]here must be a rational basis of record for invoking the concept of a preventive remedy." See Fairmont Foods Co. v. Hardin, 442 F.2d 762, 772 (D.C.Cir.1971). Requiring less would render the substantial evidence requirement illusory.
 
 
 27
 We are wary of disturbing the Secretary's judgment in light of the "intricate complex of regulation of milk marketing." Blair v. Freeman, 370 F.2d 229, 232 (D.C.Cir.1966). Our careful review of this record, however, has convinced us, as it did the district court, that the Secretary's decision is not supported by substantial evidence. The Secretary failed to provide an adequate explanation of his change of mind from 1975. Although the Secretary notes that the number of federal handlers distributing fluid milk in the nonfederally regulated area has increased slightly, there has been no change in the amount of milk distributed by handlers under Order 2 and Order 4. Moreover, the number of dairy farmers in the nonregulated areas supplying federal order handlers has not changed. The only evidence of a change in marketing conditions since 1975 is the fact that API is now distributing some of its milk in the area regulated by Order 2. This, in itself, does not constitute substantial evidence that the nonfederally regulated area has become a part of the federal order markets.
 
 
 28
 Moreover, the testimony of the proponents of expansion consisted of extremely general and speculative opinions. The experts were not able to provide specific examples of the problems they alleged were occurring as a result of the failure to regulate the twenty-county area under federal orders. Cf. Borden v. Butz, 544 F.2d 312, 319 (7th Cir.1976) (there was no substantial evidence to support the Secretary's decision when the testimony "consisted of hortatory, conclusory and speculative opinions and predictions").
 
 
 29
 Despite the volume of the record before us,[6] we are bound to conclude that the decision of the Secretary that the nonfederally regulated areas have become a part of the markets regulated by Order 2 and Order 4 is not supported by substantial evidence. The decision of the Secretary, therefore, cannot be permitted to be implemented.[7]
 
 III.
 
 30
 In light of the foregoing, the judgment of the district court will be affirmed.
 
 
 
 *
 The Honorable Dickinson R. Debevoise of the United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 Although the Secretary has the option of establishing individual handler pools rather than a marketwide pool, both the Orders in question in this case provide for the marketwide pooling of milk. See 7 C.F.R. Secs. 1002, 1004 (1987)
 
 
 [2]
 The Middle Atlantic Marketing Order, which now regulates the District of Columbia, Delaware, parts of Maryland and New Jersey, northern Virginia and southeastern Pennsylvania, would be expanded to include five more Pennsylvania counties. Fifteen Pennsylvania counties would be added to the New York-New Jersey Marketing Order, which now covers New York State and northern New Jersey
 
 
 [3]
 The final order amending the two Milk Marketing Orders is published at 50 Fed.Reg. 45595 (1985)
 
 
 [4]
 Handlers in Pennsylvania that are not regulated by a federal order are regulated by the PMMB
 
 
 [5]
 This cost advantage may no longer exist, however, because API is no longer a cooperative and thus is subject to PMMB minimum prices. See 640 F.Supp. at 1511 n. 11
 
 
 [6]
 The record before the Secretary consisted of nearly 4000 pages of testimony and over 60 exhibits
 
 
 [7]
 Stocker Brothers Dairy has appealed the district court's order denying its motion to intervene on behalf of the appellees in this action. In light of our disposition of this case, we believe that Stocker Brothers' appeal has been rendered academic. We therefore will not reach the merits of the appeal