

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-1-2006

# Cloverland Green v. PA Milk Marketing Bd

Precedential or Non-Precedential: Precedential

Docket No. 05-2336

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Cloverland Green v. PA Milk Marketing Bd" (2006). *2006 Decisions.* Paper 402.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/402

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-2336

CLOVERLAND-GREEN SPRING DAIRIES, INC.,

Appellant

THOMAS E. MCGLINCHEY; GERTRUDE GIORGINI;
SUE A. SPIGLER, ("Milk Consumers") (Intervenors in D.C.)

v.

PENNSYLVANIA MILK MARKETING BOARD;
BOYD WOLFF*, in his capacity as member of the Board;
LUKE F. BRUBAKER, Individually and
as member of the Board;
BARBARA GRUMBINE*, in her capacity as
member of the Board;
BOYD WOLFF, Individually;
BARBARA GRUMBINE, Individually

PENNSYLVANIA ASSOCIATION OF MILK DEALERS
(Intervenors in D.C.)

(*Amended - See Clerk's Order dated 6/29/05)

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 99-cv-00487)
District Judge: Honorable Yvette Kane

_____

Argued June 8, 2006

Before: AMBRO, FUENTES
and NYGAARD, <u>Circuit Judges</u>

(Opinion filed: September 1, 2006)

Scott T. Wyland, Esquire (Argued)
Kevin J. McKeon, Esquire
Hawke, McKeon, Sniscak & Kennard
100 North Tenth Street
P.O. Box 1778
Garrisburg, PA   17105

Counsel for Appellant

Wendy M. Yoviene, Esquire
Charles M. English, Jr., Esquire (Argued)
Glenn C. Kennett, Esquire
Thelen, Reid & Priest LLP
701 Eighth Street, N.W.
Washington, D.C.  20001

Counsel for Appellees

2

Allen C. Warshaw, Esquire
Buchanan Ingersoll & Rooney PC
17 North Second Street, 15th Floor
Harrisburg, PA 17101

Counsel for Intervenors
PA Assoc. of Milk Dealers

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

This case, on appeal for the second time to our Court, concerns whether Pennsylvania's minimum wholesale prices for fluid milk violate the dormant Commerce Clause of our Constitution. In our first opinion, we held that the District Court improperly granted summary judgment to the Pennsylvania Milk Marketing Board ("Board"),[1] and remanded to the District Court for a trial. See Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 298 F.3d 201 (3d Cir. 2002) (hereafter "Cloverland I"). The District Court then conducted a six-day

---

[1] Although the members of the Board have been sued individually in their official capacities, we refer to them as the "Board". We also note that the Pennsylvania Association of Milk Dealers intervened as a defendant in the District Court in support of the Board, and filed an appellee's brief on this appeal. For simplicity, we shall refer to all appellees as the "Board".

3

bench trial and ruled in favor of the Board.  We now affirm.

## I. **Milk Economics**

Before addressing the facts of this case, we believe it helpful (if not necessary) to explain how milk pricing works. On the surface, the path of milk from the cow to the consumer seems simple.  A farmer (commonly called a "producer") sells raw milk to a processor (or "handler").  The handler processes the raw milk into fluid milk or other dairy products, packages it, and sells the product to a retailer.  The retailer, in turn, sells to the consumer.

Yet this apparent simplicity is deceptive.  Federal and state regulations regarding the sale of milk make "Byzantine" an apt, and none too pejorative, description.  See, e.g., Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1344 (6th Cir. 1994) ("[T]he system established by [federal law] to regulate the sale of milk is of labyrinthine complexity."); Kenneth W. Bailey, Marketing and Pricing of Milk and Dairy Products in the United States 109 (1997) (noting that the rules governing milk prices are "mind-boggling");[2] Jim Chen, Around the World in Eighty Centiliters,

---

[2] We note that Professor Bailey testified as an expert witness for the Board in the District Court.  We do not, of course, cite his textbook herein as a substitute for his testimony, but rather as a reference for the workings of the federal milk pricing system, which the parties do not dispute.

15 Minn. J. Int'l L. 1, 6 (2006) (describing the federal milk pricing structure as "outlandishly complex").[3] This complexity,

---

[3] As Judge Jerome Frank of the United States Court of Appeals for the Second Circuit once observed (in terms more gilded than our era musters):

> [T]he 'milk problem' is exquisitely complicated. The city-dweller or poet who regards the cow as a symbol of bucolic serenity is indeed naive. From the udders of that placid animal flows a bland liquid indispensable to human health but often provoking as much human strife and nastiness as strong alcoholic beverages. . . . The[se] difficulties have given rise to much legislation and are reflected in many judicial decisions. . . . The milk problem is so vast that fully to comprehend it would require an almost universal knowledge ranging from geology, biology, chemistry and medicine to the niceties of the legislative, judicial and administrative processes of government. It affects an industry immense in scope, for dairying is [one of] the largest . . . branch[es] of agriculture in this country.

and the large sums of money at stake,[4] have spawned an extraordinary amount of litigation. It has been estimated that "no other commodity in the United States has been involved in as many legal challenges in regard to how it is marketed" as milk. Bailey, supra, at 3.

Two systems of milk price regulation concern us on this appeal: the federal system and Pennsylvania's state system. We describe each in turn.

## A.    Federal Milk Price Regulation

### 1.    Unique Nature of Milk

Milk is a unique agricultural commodity. The Supreme Court has recognized "two distinctive and essential phenomena of the milk industry[:] a basic two-price structure that permits a higher return for the same product, depending on its ultimate use, and the cyclical characteristic of production." Zuber v. Allen, 396 U.S. 168, 172 (1969); see also Lehigh Valley Farmers v. Block, 829 F.2d 409, 411 (3d Cir. 1987) (same). The

Queensboro Farms Prods. v. Wickard, 137 F.2d 969, 974-75 (2d Cir. 1943).

[4] In 2003, for example, U.S. dairy farmers sold about 19.7 billion gallons of milk for more than $21 billion. Gen. Accounting Office, Dairy Industry: Information on Milk Prices, Factors Affecting Prices, and Dairy Policy Options 1 (2004).

6

first phenomenon derives from the fact that raw milk may be put to two general uses by handlers: fluid milk for drinking and manufactured dairy products such as cheese, butter, and ice cream. See Zuber, 396 U.S. at 172. Fluid milk is more expensive for handlers to produce and market because it is highly perishable (a gallon of milk must ordinarily be marketed to the consumer within two days of milking), requires more sanitation and processing than other dairy products, and is heavier and thus more expensive to transport. See id. at 173 n.3; Bailey, supra, at 34, 46, 109-10; Alden C. Manchester & Don P. Blayney, Econ. Research Serv., U.S. Dep't of Agric., Milk Pricing in the United States 2 (2001), available at http://www.ers.usda.gov/publications/aib761/aib761.pdf. Fluid milk for drinking therefore costs the consumer more per pound than milk that has been manufactured into other dairy products, and the partial inelasticity of demand for fluid milk (viewed as a dietary staple by many Americans) means profit margins on fluid milk sales may also be higher. See Bailey, supra, at 34; see also Smyser v. Block, 760 F.2d 514, 516 (3d Cir. 1985) ("Milk that is ultimately used for fluid purposes has traditionally commanded a higher price than milk of the same grade and quality used for manufactured products. This difference is not entirely accounted for by differences in cost.").

Farmers also produce two "grades" of marketable raw milk. Grade A milk is fit for drinking, and therefore can be processed into fluid milk or manufactured products, while Grade B milk is not fit for drinking but may be used in other dairy

7

products.  Manchester & Blayney, supra, at 2; David L. Baumer, Federal Regulation of Milk Production and Sale is Growing at the Expense of State Authority, 12 J. Agric. Tax. & L. 36, 38-39 (1990).  Not surprisingly, in an entirely unregulated market, handlers would have an incentive to produce manufactured dairy products using Grade B milk and reserve as much Grade A milk as possible for the more lucrative fluid milk market.  At the same time, farmers would want to be paid a higher price for their Grade A milk than for Grade B milk, but handlers would want to pay less for Grade A milk they intended to put to use in manufactured dairy products (i.e., surplus Grade A milk they cannot sell as fluid milk).

The complexity deepens when we consider the second phenomenon identified in Zuber: the cyclical nature of milk production.  Demand for fluid milk, though somewhat inelastic with respect to price, is temporally cyclic, with demand higher in the fall and winter months than in the spring and summer months.  See Zuber, 396 U.S. at 172-73; Bailey, supra, at 34; see also John R. Snyder, A Summary: Political and Economic Analysis of Milk Marketing, 1980-81 Agric. L.J. 297, 310-11.  Unfortunately, cows do not work this way, and produce more milk in the spring and summer (known as the "flush" season) than in the fall and winter (the "short-supply" season).  Manchester & Blayney, supra, at 2; Snyder, supra, at 310-11.  Thus, "it [is] necessary to coordinate a supply that is rising when fluid milk demand is falling."  Manchester & Blayney, supra, at 2.  Otherwise, handlers would attempt to "take advantage of this

surplus to obtain bargains [from producers] during glut periods," which would lead farmers to increase production to maintain a steady income, "and the disequilibrium snowballs." Zuber, 396 U.S. at 173; Smyser, 760 F.2d at 516 ("In an unregulated market 'cutthroat' competition for more profitable fluid milk sales can lead to an overall decline in prices."); see also Bailey, supra, at 110 (explaining that the unique characteristics of the milk industry, if unregulated, lead to "chaotic marketing conditions").

## 2.    The Federal System

Federal regulation of the nation's dairy industry began in earnest in the 1930s, when falling prices caused by the Great Depression led to "utter chaos" in the milk market. Zuber, 396 U.S. at 174. The first attempt at regulation was the Agricultural Adjustment Act ("AAA") of 1933, 48 Stat. 31, which empowered the Secretary of Agriculture to promulgate emergency licensing requirements in the dairy industry to regulate output and price. See Zuber, 396 U.S. at 174-75. The Supreme Court's decision in A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935), however, struck down a similarly broad delegation of rulemaking authority under the National Industrial Recovery Act of 1933, 48 Stat. 195, and Congress acted to protect regulation of the dairy market by first amending the AAA and then enacting the Agricultural Marketing Agreement Act ("AMAA") of 1937, 50 Stat. 246, which replaced the emergency measures with a permanent system of milk regulation. See Zuber, 396 U.S. at 175-76;

9

<u>Defiance Milk Prods. Co. v. Lyng</u>, 857 F.2d 1065, 1066-67 (6th Cir. 1988).

Under the AMAA, the Secretary of Agriculture is empowered to regulate the nation's milk markets by issuing "orders" that regulate prices in defined geographic areas. <u>See</u> 7 U.S.C. § 608c(1); <u>Defiance</u>, 857 F.2d at 1067; <u>Lehigh Valley</u>, 829 F.2d at 411. These orders are meant to ensure "a sufficient quantity of pure and wholesome milk to meet current needs and further to assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs." 7 U.S.C. § 608c(18). Although their number has varied over the years, there are currently ten federal milk marketing order areas.[5] <u>See</u> 7 C.F.R. pts. 1001-1135; U.S. Dep't of Agric.,

---

[5] These are the Northeast, Appalachian, Southeast, Florida, Mideast, Upper Midwest, Central, Southwest, Arizona, and Pacific Northwest orders. <u>See</u> U.S. Dep't of Agric., Consolidated Milk Marketing Order Areas, <u>available at</u> http://www.ams.usda.gov/dairy/dymap.htm. There are also several parts of the country that are not regulated by a federal order, including parts of Idaho, New York, Pennsylvania, and North and South Dakota, and most or all of California, Maine, Montana, Nevada, Utah, Virginia, and Wyoming. <u>Id.</u>

Confusingly, the orders are often referred to by a number that corresponds to the implementing regulation that defines the order. So, for example, the Northeast order (encompassing all or part of Vermont, New Hampshire, Massachusetts, Rhode Island, Connecticut, New York, Pennsylvania, New Jersey,

Consolidated Milk Marketing Order Areas, available at http://www.ams.usda.gov/dairy/dymap.htm. Within these orders, the Secretary sets prices at which raw milk may be sold. There are two main features of this pricing structure that merit explanation.

Handlers pay for their milk according to a classified pricing arrangement. See 7 U.S.C. § 608c(5)(A). Grade A raw milk is classified according to its end use. Class I milk is fluid milk for drinking, while other classes (II, III, and IV) are assigned to raw milk used in various manufactured products. 7 C.F.R. § 1000.40; see West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 189 n.1 (1994). It is not necessary for our purposes to explain in detail the pricing mechanism for each class, see, e.g., 7 C.F.R. § 1000.50; we simply note that handlers pay more for Grade A raw milk they intend to put to use as Class I milk than they do for Grade A raw milk they intend to put to use as Class II, III, or IV milk.[6] See Lansing Dairy, 39 F.3d at 1344; Smyser,

_____

Delaware, Maryland, and the District of Columbia, as well as a few counties in Northern Virginia) is defined in 7 C.F.R. part 1001, and is known commonly as "Order 1". The Mideast order (encompassing all or part of Michigan, Indiana, Ohio, Kentucky, West Virginia, and Pennsylvania) is defined in 7 C.F.R. part 1033, and is known commonly as "Order 33".

[6] To be clear, however, the different classes are merely administrative distinctions to take account of the fact that handlers charge different wholesale prices for fluid milk and

11

760 F.2d at 516.

Producers do not, however, receive more or less money for raw milk based on the handler's use. Instead, producers receive a uniform "blend" price that is essentially a weighted average of the price of all classes of milk sold in the region. See 7 U.S.C. 608c(5)(B); Zuber, 396 U.S. at 177; Lehigh Valley, 829 F.2d at 411. This system "eliminate[s] the potential situation where one producer, who sold milk to a fluid processor, would get a higher milk price than his neighbor who sold to a cheese plant." Bailey, supra, at 113; see also Lehigh Valley, 829 F.2d at 411-12 ("By mandating that producers within a market area receive a uniform price based on the use of milk within the area, the [AMAA] eliminates the incentive for dairy farmers to attempt to compete with their neighbors through lowering their prices.").

Of course, this would ordinarily lead to a situation in which handlers dealing mostly in lower classes of milk essentially subsidize those dealing mostly in Class I milk, because the blend price paid to the producer will be more than, say, the classified price of Class IV milk, but lower than the classified price of Class I milk. To compensate for this, the regulations establish a "Producer Settlement Fund," into which

---

manufactured products. The raw milk is all Grade A, and is alike in all respects except the artificially created class distinction that depends on the use to which the milk is put.

12

handlers who have underpaid contribute an amount equal to the difference between the blend price and classified price, which is then distributed to handlers who have overpaid. See 7 C.F.R. § 1000.70; Lansing Dairy, 39 F.3d at 1344; Smyser, 760 F.2d at 516.

By charging handlers less for Grade A raw milk used in storable dairy products like cheese and butter than for raw milk used as Class I drinking milk, while assuring that producers are paid the same no matter the use to which the raw milk is put, handlers have an incentive to use surplus Grade A milk in manufactured products during the glut months, and producers maintain a more stable income year-round. This, in turn, guards against overproduction in the flush season. Moreover, the Producer Settlement Fund relieves pressures on handlers to deal exclusively in fluid milk to the detriment of other dairy products.

## B.     Pennsylvania Milk Price Regulation

Although state control of milk markets has declined significantly in the wake of federal regulation, particularly through court challenges, it survives in a few states, including Pennsylvania. See Bailey, supra, at 205, 210; see generally Baumer, supra. Parts of Pennsylvania are federally regulated — the southeast and southcentral parts of the Commonwealth are under the Northeast order, and the western part of the Commonwealth is under the Mideast order — while other parts

13

are not regulated by the federal system. Pennsylvania's system covers the entire Commonwealth, however.

Under Pennsylvania's Milk Marketing Law, 31 Pa. Cons. Stat. § 700j, the Board is granted "power to supervise, investigate and regulate the entire milk industry of th[e] Commonwealth, including the production, transportation, disposal, manufacture, processing, storage, distribution, delivery, handling, bailment, brokerage, consignment, purchase and sale of milk and milk products in th[e] Commonwealth." 31 Pa. Cons. Stat. § 700j-301. The statute requires that all handlers operating in Pennsylvania be licensed by the Board, see id. § 700j-401, and empowers the Board to set minimum prices paid to producers, handlers, and retailers to "benefi[t] . . . the public interest [and] best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to [its] inhabitants." Id. § 700j-801.

In-state handlers who buy raw milk from in-state producers for in-state use must pay "over-order" prices — which include a premium above the applicable Class I milk prices — to assure producers a "reasonable return" based on the "conditions affecting the milk industry in each marketing area."[7]

_____

[7] According to the Board, "the state-mandated premium has resulted in over 335 million additional dollars being paid to Pennsylvania farmers" since 1988. Pa. Milk Mktg. Bd., Fiscal Year Report, 2003-2004 10 (2004), available at http://

14

Id.; see also id. § 700j-803 ("The [B]oard shall fix, by official order, the minimum prices or a formula for setting of minimum prices to be paid by milk dealears or handlers to producers for milk or milk components sold or delivered or made available on consignment or otherwise by producers to dealers or handlers."). The over-order premium only applies to sales of Class I milk. See Pa. Milk Mktg. Bd., Order No. A-913 (2001) (establishing the method for calculating the over-order premium, and specifying that the premium "shall be based on milk that is produced, processed, and utilized as Class I milk in Pennsylvania").[8]

Pennsylvania also exports raw milk to other states. The over-order price, however, does not apply to sales to out-of-state handlers.

---

www.mmb.state.pa.us/mmb/lib/mmb/2003-2004.pdf. From July 2003 to June 2004, the over-order premium resulted in Pennsylvania farmers receiving $30.8 million more than they would otherwise have received. Id. at 13.

[8] The Board has promulgated a complex mathematical formula for calculating the over-order premium. See Pa. Milk Mktg. Bd., Order No. A-913 (2001). It is not necessary to explain that process here. As of this writing, in all Pennsylvania milk marketing areas handlers must add $1.60 per hundredweight (approximately 11.6 gallons) to the price of Class I milk. See Pa. Milk Mktg. Bd., Order No. A-938 (2006).

15

All handlers who sell milk to retailers in Pennsylvania must do so at minimum wholesale prices that also guarantee a "reasonable return," which state law defines as between 2.5% and 3.5% of net sales. 31 Pa. Cons. Stat. § 700j-801; see also id. § 700j-802 ("The [B]oard shall fix, by official order . . ., the minimum wholesale and retail prices, and may fix, by official order, the maximum wholesale and retail prices, to be charged and received by milk dealers or handlers for milk sold, delivered, handled or consigned within any milk marketing area of the Commonwealth.").

The Board has divided Pennsylvania into six milk marketing areas. Areas 1 and 4 (the Areas at issue in this appeal) consist of the counties in southeast and southcentral Pennsylvania that are also covered by the federal Northeast order. Area 5 consists of the counties in western Pennsylvania that are also covered by the federal Mideast order. The remaining Areas (2, 3, and 6) consist of the counties that are not regulated by the federal order system. See Pa. Milk Mktg. Bd., Fiscal Year Report, 2003-2004 10 (2004), available at http://www.mmb.state.pa.us/mmb/lib/mmb/2003-2004.pdf. The Board sets minimum wholesale and retail prices, as well as over-order premiums, in each Area based on the circumstances of that region, and enforces the minimum prices by regular audits of handlers' books. Id. Anyone who sells milk (raw or processed) at a price below the mandatory minimums set by the Board is subject to criminal penalties, including fines or imprisonment. 31 Pa. Cons. Stat. § 700j-1001 & 1002.

The United States Department of Agriculture ("USDA") has identified several important differences between the Pennsylvania system and the federal orders. First, Pennsylvania divides milk into only two classes when calculating the price handlers must pay, as opposed to the four classes applicable to prices under federal orders. See Milk in the New England and Other Marketing Areas, 64 Fed. Reg. 16,026, 16,056 (Apr. 2, 1999). As in the federal system, Class I milk in Pennsylvania is primarily fluid milk for drinking, but Class II milk encompasses all other dairy products. Second, the location where milk is distributed for sale determines the applicable minimum price in Pennsylvania, while under federal orders the price is determined based on the handler's plant location. Id. Third, blend prices paid to farmers under the Pennsylvania system are calculated based on the individual handler's usage, and not the use of the various milk classes in the wider market. Id.; see also 7 Pa. Code § 143.11 ("Dealers shall pay their producers on a weight and butterfat basis as determined by the utilization of the milk received at each plant or receiving station."). This includes, of course, the over-order premium, which is added to the Class I price and then (as part of the Class I price) blended with the Class II price to yield the handler's "plant blend" price paid to its producers.

## II. Facts and Procedural History

With this background in mind, we proceed to the facts of this case. Appellant Cloverland-Green Spring Dairies, Inc.

17

("Cloverland") is a milk handler located in Maryland. It buys approximately 90% of its raw milk from Pennsylvania producers, but does not sell processed fluid milk in Pennsylvania. In March 1999, Cloverland brought suit against the Board's members in their official capacities under 42 U.S.C. § 1983, alleging that Pennsylvania's milk pricing scheme eliminates competition based on price and, as such, nullifies Cloverland's competitive advantages, thereby effectively barring it from Pennsylvania's market. This, it argues, violates the Constitution's dormant Commerce Clause (described in Part III.A below). Three individual milk consumers in Pennsylvania intervened as plaintiffs in the suit, and the Pennsylvania Association of Milk Dealers intervened as a defendant in support of the minimum prices.

## A.     Summary Judgment and Appeal

The District Court granted summary judgment to the Board, see Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 138 F. Supp. 2d 593 (M.D. Pa. 2001), and Cloverland appealed. We affirmed the grant of summary judgment with respect to Pennsylvania's minimum retail prices (i.e., prices charged to consumers, which are not at issue on this appeal), but reversed with respect to the minimum wholesale prices. Cloverland I, 298 F.3d at 205. Viewing all facts in the light most favorable to Cloverland — as required at that stage of the proceedings, see id. — we held that a reasonable trier of fact could find (on the facts presented) that Pennsylvania's minimum

18

wholesale milk prices were unconstitutional, thus precluding summary judgment for the Board. Specifically, we noted that Cloverland indicated it had evidence that it could offer prices below Pennsylvania's wholesale floor. Although, based on the limited record available at that stage of the proceedings, it was not entirely clear to us why Cloverland could offer lower prices, id. at 207, we observed that Cloverland (as an out-of-state handler) is exempt from paying the over-order premium on Class I milk purchased from Pennsylvania producers, and thus its raw milk costs could be lower than similarly situated Pennsylvania handlers. Id. at 213. As such, "a reasonable trier of fact could find that Pennsylvania's minimum wholesale prices eliminate a competitive advantage enjoyed by out-of-state dealers like Cloverland," which would trigger heightened scrutiny under the dormant Commerce Clause. Id. at 213. Moreover, there was no evidence (at that time) that there were Pennsylvania firms more efficient than Cloverland, and thus the minimum price floors did not necessarily affect all in-state and out-of-state firms equally. Id.[9]

---

[9] Indeed, on the facts Cloverland offered, it appeared to us that "[b]y calibrating wholesale price floors for a particular milk marketing area to the operating costs of average dealers in that area, the Commonwealth enables Pennsylvania dealers to operate less efficiently without fearing losses to lower-cost competitors like Cloverland. This aspect of Pennsylvania's scheme appears to run afoul of the cardinal rule that states may not shield in-state businesses from out-of-state competitors." Cloverland I, 298 F.3d at 214 n.17.

19

Even if the District Court were to conclude that heightened scrutiny did not apply, we held that "the record . . . amply supports a finding that the wholesale floors . . . incidentally burden interstate commerce by making it more difficult for out-of-state dealers to attract new business in a market dominated by in-state dealers," id. at 215, and thus the District Court would have to employ the balancing test set forth in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970), to determine whether the burdens on interstate commerce substantially outweighed the putative local benefits. Cloverland I, 298 F.3d at 215. We held that the "the purpose asserted in the [Pennsylvania Milk Marketing Law's] text deserve[d] little deference" in identifying the law's benefits because no Pennsylvania milk processors objected to the minimum prices (indeed, the Pennsylvania Association of Milk Dealers intervened in support of the law), and the price scheme therefore "appear[ed] to [burden] only . . . out-of-state dealers." Id. at 216. Moreover, we found only "meager evidence" that the minimum prices were necessary to sustain Pennsylvania's dairy industry — since "the federal producer price floors [appear to] provide ample protection against predatory pricing" in other states, and the Pennsylvania dairy industry was quite successful (indeed, it exported most of its raw milk) — and thus it seemed to us unlikely that the minimum prices were necessary to secure a supply sufficient to meet the needs of Pennsylvania's residents. Id. at 216-17. Moreover, the burdens on interstate commerce appeared substantial: Cloverland's stated evidence suggested it was "virtually impossible to displace incumbent

20

dealers in Pennsylvania without offering prices below the Board-mandated floors." Id. at 217. Thus, construing all the facts in the light most favorable to Cloverland, the Commonwealth's minimum wholesale milk prices could fail the Pike balancing test.

## C.    Second District Court Proceeding

On remand, the District Court permitted full discovery and held a bench trial at which numerous witnesses testified. Based on this evidence, the Court made detailed findings of fact that largely contradicted the facts (viewed in the light most favorable to Cloverland) on which we relied in our earlier decision. The District Court found that Cloverland — which, again, buys about 90% of its raw milk from Pennsylvania suppliers — purchases about 35% of this milk from dairy farm cooperatives, which negotiate prices with Cloverland equal to the over-order price charged to Pennsylvania processors. Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., No. 1:CV-99-487, slip op. at 5 (M.D. Pa. 2005) (hereafter "Cloverland II"). The other 65% is purchased from independent Pennsylvania farmers, who do not charge the over-order premium to Cloverland because, as an out-of-state handler, it is exempt. Id. at 6. The Board nonetheless offered expert testimony that Cloverland actually had higher raw milk costs and was less efficient than three of four sample dairies, which the Court accepted because Cloverland did not produce

21

sufficient countervailing evidence.[10]  Id. at 6, 15.  Thus, the Court found that "[a]lthough Cloverland can sell milk at a cost below the minimum wholesale price floor established by the Board, Cloverland does not have an out-of-state price or efficiency comparative advantage."  Id. at 6.

Indeed, the Court concluded that, even if Cloverland's exemption from the over-order premium conferred an advantage because it is an out-of-state firm, that advantage "arises from the very Milk Law pricing structure [Cloverland] seeks to partially invalidate," and thus, if Cloverland's suit were successful, its advantage would be "ephemeral."  Id. at 16.  In the Court's view,  the invalidation of the wholesale price would necessarily lead to the abandonment of the over-order premium, which would make it economically unfeasible for small dairy farms to remain in business and thus would force them into cooperatives (which negotiate prices with out-of-state processors equal to the over-order price).  Id. at 15-16.

The District Court also found that, although "[m]ost processors sell at or around the wholesale floor price, [thus] precluding appreciable amounts of competition based upon price," id. at 6-7, Cloverland failed to show that competition on non-price factors did not exist.  Indeed, the Court found

---

[10]  The District Court expressly found the Board's expert on milk pricing to be more credible than Cloverland's.  Cloverland II, slip op. at 6 n.4.

22

"competition among processors in quality, service, and the ability to bundle the delivery of non-milk based drinks," and "[a]lthough price is a significant factor in competing for business within the Pennsylvania dairy market, twice as many retailers choose name recognition as the number one factor informing their choice of supplier." Id. at 7. Thus, even if Cloverland could compete on the basis of price, the Court found that it failed to prove it could penetrate the Pennsylvania market. Id.[11] Indeed, the Court noted that Cloverland only attempted

---

[11] At one point in its opinion, the District Court stated that "Cloverland has established that it can compete with Pennsylvania dealers only by selling milk at prices below the wholesale milk floor," Cloverland II, slip op. at 7 (emphasis added), but we do not believe the Court meant what it literally said. In the same paragraph, the Court explained that robust competition exists in the Pennsylvania market on a variety of non-price factors, and "even were Cloverland able to establish that it could sell milk for the lowest price, [it] would not enjoy a competitive advantage that would enable it to penetrate the Pennsylvania dairy market." Id. (emphasis added). The Court expressly found "that the minimum price floor does not have the practical effect of preventing Cloverland from entering the Pennsylvania milk market," id. (emphasis added), and later observed that Cloverland "offered no credible evidence that it could in fact compete in the Pennsylvania marketplace, absent of the Milk law." Id. at 20.

Under these circumstances, we are confident that the District Court, by typographical error or otherwise, misstated the intended proposition when it said Cloverland did establish the

23

(and failed) to solicit business from three retailers in Area 4 and none in Area 1, and provided no evidence that these retailers rejected it because of price. Id. at 6, 20.

Thus, the District Court concluded that Cloverland failed to prove that the Pennsylvania Milk Marketing Law nullified any competitive advantage it enjoyed by virtue of being an out-of-state firm, and thus heightened scrutiny did not apply.

The Court then considered whether the minimum pricing scheme's incidental burdens on interstate commerce substantially outweighed the putative local benefits, as required by the Pike balancing test. It concluded that minimum wholesale prices confer substantial benefits on Pennsylvania's dairy industry, because the federal minimums "ha[ve] not adequately guaranteed enough income to protect Pennsylvania dairy farms since 1988," when federal deregulation lowered the minimums. Id. at 8, 26. Minimum wholesale prices allow handlers a sufficient return to enable them to pay the over-order premium, which in turn allows Pennsylvania's independent dairy farms to survive. Id. at 8, 24. Based largely on evidence produced at trial regarding the abolition of minimum prices in California, the District Court concluded that if Pennsylvania's market were dominated by a few large players, "[c]onsumer prices would fall in the short term, but rise heavily in the long term." Id. at 9, 25. And, if small farms went out of business,

---

very thing it repeatedly explained Cloverland did not establish.

the Court concluded that the "agricultural infrastructure" that supports the dairy industry — including "dealers, feed stores, veterinarians, and other business[es]" — might suffer.[12] Id. at 9, 26.

In contrast, the Court found only incidental burdens on interstate commerce: the minimum prices simply placed Cloverland on the same footing as every other handler doing business in Pennsylvania, did not prevent interstate competition on non-price factors, and the dominance of incumbent handlers could be attributed to Pennsylvania retailers' preference for doing business with local handlers "independent of regulatory pressures." Id. at 22. Thus, the Court held that, under the Pike test, Cloverland failed to prove a violation of the dormant Commerce Clause, and granted judgment in the Board's favor. Cloverland appeals.[13]

_____

[12] These conclusions were based largely on the testimony of the Board's experts, which the District Court expressly found more credible than Cloverland's expert. Cloverland II, slip op. at 27.

[13] The District Court had subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1332, and we have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. Our review of the District Court's decision is subject to familiar standards: we review findings of fact for clear error (meaning we will reverse only if we are "left with a definite and firm conviction that a mistake has been committed"), and exercise

25

## III. <u>Analysis</u>

Cloverland raises two issues on appeal.  It contends its competitive advantages require heightened scrutiny, regardless whether those advantages derive from its status as an out-of-state firm, and that the mandatory minimum wholesale prices are the only reason it cannot compete in the Pennsylvania market.  Even if heightened scrutiny does not apply, Cloverland argues that under the <u>Pike</u> test the burdens on interstate commerce clearly outweigh any putative benefits.

### A.     The Dormant Commerce Clause

Under the federal Constitution's Commerce Clause, Congress has explicit power to "regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  This clause also has an implied requirement (often called the "negative" or "dormant" aspect of the clause) that states not "mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." <u>Granholm v. Heald</u>, 544 U.S. 460, 472 (2005) (internal quotation marks omitted); <u>West Lynn Creamery</u>, 512 U.S. at 192-93 (same).  Under the dormant Commerce Clause, it is "[a]xiomatic . . . that a state cannot impede free market forces to shield in-state businesses from out-of-state competition."

---

plenary review over legal conclusions.  <u>Gordon v. Lewiston Hosp.</u>, 423 F.3d 184, 201 (3d Cir. 2005).

26

<u>Cloverland I</u>, 298 F.3d at 210. This includes "forcing [out-of-state businesses] to 'surrender whatever competitive advantages they may possess'" as the price of doing business in the state. <u>Id.</u> (quoting <u>Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.</u>, 476 U.S. 573, 580 (1986)).

In considering whether a state law violates the dormant Commerce Clause, the inquiry is twofold: a court considers first whether "heightened scrutiny" applies, and, if not, then considers whether the law is invalid under the <u>Pike</u> balancing test. <u>See, e.g.</u>, <u>Cloverland I</u>, 298 F.3d at 210-11.

Heightened scrutiny applies when a law "discriminates against interstate commerce" in its purpose or effect. <u>C & A Carbone, Inc. v. Town of Clarkstown</u>, 511 U.S. 383, 390 (1994); <u>Harvey & Harvey, Inc. v. County of Chester</u>, 68 F.3d 788, 797-98 (3d Cir. 1995).[14] The party challenging the statute has the burden of proving the existence of such discrimination, <u>Harvey & Harvey</u>, 68 F.3d at 802, and the burden then shifts to the state to prove that "the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means." <u>Maine v. Taylor</u>, 477 U.S. 131, 138 (1986); <u>Harvey & Harvey</u>, 68 F.3d at 797 (same). This standard

---

[14] Notably, "in order to find a dormant Commerce Clause violation there is no requirement that discrimination must be the 'primary' purpose or effect" of the challenged state law. <u>Harvey & Harvey</u>, 68 F.3d at 803.

renders all but the most unusual statute invalid. <u>Carbone</u>, 511 U.S. at 393; <u>Brown-Forman</u>, 476 U.S. at 579 ("When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry."); <u>Cloverland I</u>, 298 F.3d at 210-11; <u>see also</u> <u>Harvey & Harvey</u>, 68 F.3d at 797 (referring to this standard as "strict scrutiny").

There are two general types of discrimination that a plaintiff may show to trigger heightened scrutiny (although they are not entirely distinct, and overlap in many ways). First, it may show that the challenged state statute has extraterritorial effects that adversely affect economic production (and hence interstate commerce) in other states, thereby forcing "producers or consumers in other States [to] surrender whatever competitive advantages they may possess" to "give local consumers an advantage over consumers in other states." <u>Brown-Forman</u>, 476 U.S. at 580; <u>see</u> <u>Baldwin v. G.A.F. Seelig, Inc.</u>, 294 U.S. 511, 521, 527 (1935) ("New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there," because such regulation "set[s] up what is equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin.").

Second, it may show that the "object [of the law] is local economic protectionism," in that it disadvantages out-of-state

28

businesses to benefit in-state ones.  Carbone, 511 U.S. at 390; see West Lynn Creamery, 512 U.S. at 194-96 (holding that a Massachusetts state law requiring milk processors, including out-of-state firms, to pay a premium to a state fund that was then disbursed only to in-state producers was "effectively a tax which makes milk produced out-of-state more expensive," thus discriminating against out-of-state milk); Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 351-53 (1977) (overturning a North Carolina statute that forbade importing apples bearing a quality mark other than one issued by the USDA, because Washington's apples bore a state quality mark and thus "the statute's consequence [is] raising the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected"); Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 375-77 (1964) (holding that a Florida statute requiring in-state milk processors to purchase raw milk from in-state producers unlawfully discriminated against interstate commerce).[15]

---

[15]  The Board argues that the Supreme Court's decision in Pharmaceutical Research and Manufacturers of America v. Walsh, 538 U.S. 644 (2003), stands for the proposition that two "separate and distinct" types of heightened scrutiny analysis exist (extraterritorial effect and discrimination), and that "extraterritorial effect" cases like Baldwin and Brown-Forman are not relevant to "discrimination" cases like Carbone and Harvey, and vice versa.  Pa. Milk Mktg. Bd. Br. at 49-51.

The Board substantially overreads Pharmaceutical

29

In deciding whether a state law discriminates against out-of-state businesses, it is immaterial whether the statute or ordinance also burdens some in-state businesses. See Carbone, 511 U.S. at 391 ("The ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition."); Cloverland I, 298 F.3d at 214 (noting that Carbone "'explicitly rejected the argument that a disputed statute would have to favor all in-state businesses as a group —

Research. The Supreme Court discussed the "extraterritorial effect" cases apart from other discrimination cases only because the petitioner framed its argument that way. See Pharm. Research, 538 U.S. 669-70. Nowhere did the Supreme Court suggest that the two lines of cases are mutually exclusive; indeed, so-called "discrimination" cases like Carbone, West Lynn Creamery, and Washington State Apple rely heavily on so-called "extraterritorial effect" cases like Baldwin, and vice versa. As we noted in Cloverland I, both types of cases may share the common element of "state laws that are facially neutral but have the effect of eliminating a competitive advantage possessed by out-of-state firms, [thus] trigger[ing] heightened scrutiny." 298 F.3d at 211 (citing Wash. State Apple, 432 U.S. 333, and Baldwin, 294 U.S. 511); see also id. at 212 n.14 ("[T]he problem with the law invalidated in Baldwin was not merely its extraterritorial reach, but that it had the practical effect of discriminating against out-of-state milk producers by eliminating their competitive advantage."). Thus, while it may sometimes be useful to consider the two types of cases separately for ease of analysis, they are actually just two forms of discrimination, with significant overlap.

30

a statute may be invalid if it favors only a single or finite set of businesses'" (quoting <u>Harvey & Harvey</u>, 68 F.3d at 798)).

If the plaintiff does not succeed in showing that the purpose or effect of the state law discriminates against interstate commerce — but, rather, the statute "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental" — the court must determine whether "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." <u>Pike</u>, 397 U.S. at 142; <u>Cloverland I</u>, 298 F.3d at 211 (same). This balancing test is significantly less restrictive of state laws than heightened scrutiny.

Often, "there is no clear line separating the category of state regulation that is virtually <u>per se</u> invalid under the Commerce Clause, and the category subject to the <u>Pike v. Bruce Church</u> balancing approach." <u>Brown-Forman</u>, 476 U.S. at 579; <u>see</u> <u>Cloverland I</u>, 298 F.3d at 211 ("[S]ometimes the distinction between state laws subject only to <u>Pike</u> balancing and those that are nearly <u>per se</u> invalid is 'hazy.'"). In determining whether heightened scrutiny should be applied instead of the <u>Pike</u> test, "the critical consideration is the overall effect of the statute on both local and interstate activity," <u>Brown-Forman</u>, 476 U.S. at 579, with special attention paid to whether a "facially neutral" state law "ha[s] the effect of eliminating a competitive advantage possessed by out-of-state firms" (which "trigger[s] heightened scrutiny"). <u>Cloverland I</u>, 298 F.3d at 211.

31

## B.     Heightened Scrutiny

Cloverland's argument against the District Court's heightened scrutiny analysis may be distilled as follows. The District Court concluded that Cloverland has some advantages over some Pennsylvania firms — it is more efficient than some, it sells milk in Maryland for less than the minimum wholesale prices that exist in Pennsylvania, and its exemption from the over-order premium for raw milk purchased from independent Pennsylvania dairy farmers means its raw milk costs might theoretically be lower than its Pennsylvania competitors' costs. Although these advantages may not derive necessarily from Cloverland's status as an out-of-state handler,[16] the argument proceeds, there is no question that Pennsylvania's minimum prices level the playing field with Pennsylvania firms that have higher costs and are less efficient, thus nullifying Cloverland's alleged competitive advantages. Since it is an out-of-state firm, Cloverland contends the pricing scheme necessarily restrains interstate commerce. Moreover, it asserts that Pennsylvania's in-state processors are so entrenched (we noted previously that "in-state dealers dominate the wholesale milk market in Pennsylvania," Cloverland I, 298 F.3d at 217), other means of competition are so lacking, and the wholesale minimums are set so high (such that they effectively set the actual price for all

---

[16] Cloverland's exemption from the over-order premium is due to its status as an out-of-state firm, but it argues this fact is not relevant to the heightened scrutiny analysis.

handlers), that no out-of-state firm can compete in the Pennsylvania market without offering a lower price. As we summarized the argument, "[p]reventing dealers from attracting customers by offering lower prices . . . helps in-state dealers maintain their traditional hegemony." Id.

> ### 1. Must a Competitive Advantage Arise from Cloverland's Status as an Out-of-State Firm?

Although Cloverland's arguments were persuasive on the limited facts (construed in Cloverland's favor) available in Cloverland I, they are less compelling in light of the factual record developed at trial. As a starting point, we note that Cloverland is incorrect that, at least on the facts of this case, state regulations that nullify a competitive advantage unrelated to the firm's out-of-state status may nonetheless, on their own, trigger heightened scrutiny.

As the District Court framed the issue, "courts have struggled with . . . the difficulty in examining laws which do not facially discriminate against out-of-state interests under [d]ormant Commerce Clause jurisprudence. When does a simple economic advantage rise to the level of [a] competitive advantage, within the heightened scrutiny context?" Cloverland II, slip op. at 16-17. The Supreme Court has never expressly

addressed this issue, but it has often stated that a state law that "cause[s] local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market" is unconstitutional "because it, like a tariff, 'neutraliz[es] advantages belonging to the place of origin.'" West Lynn Creamery, 512 U.S. at 196 (quoting Baldwin, 294 U.S. at 527) (internal quotation marks omitted) (emphasis added); Polar Ice Cream, 375 U.S. at 377 (same with respect to a Florida law barring in-state handlers from buying raw milk from out-of-state producers); see also Wash. State Apple, 432 U.S. at 351 (noting that a North Carolina statute forbidding importing apples with a non-USDA quality mark "has the effect of stripping away from the Washington apple industry the competitive and economic advantages it has earned for itself though its expensive inspection and grading system").

We have observed that "[t]he Supreme Court's opinions in Baldwin and Washington State Apple show that if a state regulation has the effect of protecting in-state businesses by eliminating a competitive advantage possessed by their out-of-state counterparts, heightened scrutiny applies. . . . [Here,] a reasonable trier of fact could find that Pennsylvania's minimum wholesale prices eliminate a competitive advantage enjoyed by out-of-state dealers like Cloverland." Cloverland I, 298 F.3d at 212-13. By referencing a "competitive advantage enjoyed by out-of-state dealers" not shared by in-state dealers, we presumed the advantage would have something to do with the out-of-state status of the advantaged firms.

34

Cloverland argues, however, that it need not prove a cost advantage linked to its place of origin. It contends that the mere fact it has some efficiency advantage (for whatever reason) over at least one in-state firm means it can sell milk for less, and because Pennsylvania's minimum wholesale prices nullify its ability to do so, they render meaningless its efficiency advantage and thus trigger heightened scrutiny.

The ramifications of this argument are expansive. Cloverland's proposed rule would eviscerate longstanding Supreme Court precedent that "price regulation [is not] an impermissible burden upon commerce" where "the burden on commerce is indirect and only incidental to the regulation of an essentially local activity," Polar Ice Cream, 375 U.S. at 378 (citing Milk Control Bd. of Pa. v. Eisenberg Farm Prods., 306 U.S. 346 (1939), and Highland Farms Dairy v. Agnew, 300 U.S. 608 (1937)) — subject, of course, to the Pike balancing test. See Cloverland I, 298 F.3d at 215-16. As the District Court noted, in any state with minimum price regulations, there will always be some out-of-state competitors (like Cloverland) that have some advantages over at least one in-state firm, even though those advantages may reflect differences in capacity, efficiency, workers, etc., that have nothing to do with the firm's location (and indeed are shared with many in-state firms). See Cloverland II, slip op. at 16-17, 19. Thus, under Cloverland's proposed rule, state milk price regulations will always be subject to heightened scrutiny (and thus nearly per se invalid), despite the fact we and the Supreme Court have clearly recognized this

35

is not always the case. If the neutralization of any advantage possessed by any out-of-state firm were enough to trigger heightened scrutiny, it is difficult to think of a state pricing regulation that could survive.

The elimination of a particular competitive advantage belonging to the place of origin is not, of course, a determinative inquiry in every case. For example, where a state statute imposes an outright ban on competition by reserving all business for an in-state firm or firms and explicitly barring interstate commerce, see Carbone, 511 U.S. at 391-93; Polar Ice Cream, 375 U.S. at 376-77, or targets out-of-state firms for special burdens from which in-state firms are exempt, see West Lynn Creamery, 512 U.S. at 194-95; Wash. State Apple, 432 U.S. at 350-51, the problem is more blatant: the out-of-state firms are subjected to overt discrimination or an outright ban on competition. But Cloverland does not allege those barriers here. Rather, it alleges more subtle discrimination, stemming from a law and regulatory scheme that are not facially discriminatory. Hence, a nexus between the advantage that has been neutralized and the firm's out-of-state status is necessary.

We therefore hold that, if Cloverland is to succeed in demonstrating that heightened scrutiny applies because its competitive advantages have been neutralized by the Pennsylvania Milk Marketing Law, it must establish that those advantages arise by virtue of its out-of-state status.

2. <u>Does Cloverland Have an Out-of-State Competitive Advantage?</u>

The question becomes, then, whether the Pennsylvania Milk Marketing Law operates to neutralize competitive advantages belonging to Cloverland's place of origin. The record reveals only one such potential advantage <u>vis-a-vis</u> Cloverland's Pennsylvania competitors — its potential raw milk cost advantage due to its exemption from the over-order premium.

a. Legal Errors in the District Court's Analysis

We note at the outset two legal errors in the District Court's opinion that cannot form the basis for a determination of whether Cloverland's exemption from the over-order premium should trigger heightened scrutiny.

(1) Nexus Between the Challenged State Law and Cloverland's Advantage

We are unpersuaded by the District Court's reasoning that because Cloverland's exemption arises from Pennsylvania law, any cost advantage it has is "ephemeral" — the argument being that if the minimum wholesale prices were invalidated (as Cloverland desires), its purported raw milk cost advantage

37

would disappear because the over-order premium would no longer be viable.  We assume, without deciding, that if the minimum wholesale prices <u>themselves</u> conferred an advantage on Cloverland due to its out-of-state status, it could not rely on that advantage to challenge those prices because invalidating the prices would <u>necessarily</u> nullify the advantage (though, of course, Cloverland would have no incentive to challenge the prices in that event).  Here, however, Cloverland's purported cost advantage arises from the operation of a <u>different</u> aspect of the regulatory scheme — the over-order premium — that is not challenged in this suit.

The District Court concluded, based on the Board's evidence, that if the minimum wholesale prices were invalidated, the over-order premium would fall.  But this is not a question susceptible to definitive proof by the Board's experts.  It may well be that invalidating the minimum wholesale prices would place pressure on the Commonwealth's legislature to repeal the over-order premium or extend it to out-of-state purchasers (both of which would nullify Cloverland's supposed advantage).  The cost disadvantage to Pennsylvania handlers of paying the over-order premium and then competing against out-of-state handlers without the protection of minimum wholesale prices might make the over-order premium less feasible or encourage them to purchase out-of-state milk to avoid the premium.   But we note that, under the current system, Pennsylvania handlers already have an incentive to purchase out-of-state milk to maximize their profit margins, yet the over-

38

order premium remains strong. Moreover, even assuming Pennsylvania could constitutionally impose over-order premiums on sales of milk to out-of-state purchasers (an issue we do not decide here), doing so would presumably damage the Commonwealth's ability to export milk by essentially adding a surcharge on exports. And the Board has gone to great lengths (as explained below) to demonstrate several legal options handlers use to sell milk at below minimum wholesale prices in Pennsylvania, which suggests that invalidating the minimum wholesale prices would not necessarily harm the handlers' ability to pay the over-order premium to producers.

If the minimum wholesale prices were invalidated, the Pennsylvania legislature would be faced with these thorny policy questions and would have to weigh the competing considerations to determine whether the over-order premium provisions of 31 Pa. Cons. Stat. § 700j remain viable. There is simply no way to determine, at this stage, whether the over-order premium would <u>necessarily</u> be repealed or extended to out-of-state purchasers of Pennsylvania milk. At best, the Board's evidence and the District Court's opinion establish that such an event would be likely. We hold, though, that the <u>possible</u> removal of Cloverland's purported out-of-state advantage if it is successful on this appeal is insufficient to render that advantage irrelevant to our heightened scrutiny analysis.

(2)     Availability of Non-Price

39

Competition

We also are unpersuaded by the District Court's reliance on the availability of non-price competition in the Pennsylvania market. As we explain below, if Cloverland proves that its exemption from the over-order premium confers a cost advantage over Pennsylvania handlers that is neutralized by the Commonwealth's minimum wholesale prices, heightened scrutiny applies. The fact that Cloverland might be able to compete for some retailer accounts on non-price bases is irrelevant, because even if there are other potential paths into the Pennsylvania market that may allow an out-of-state handler successfully to obtain some business, neutralizing an out-of-state price advantage alone offends the dormant Commerce Clause (especially since the record amply demonstrates that price is — or, at least, would be if competition on price were allowed — an important factor retailers consider in choosing a supplier). See Wyoming v. Oklahoma, 502 U.S. 437, 455 (1992) (holding that a state may not insulate part of its market from out-of-state competition while leaving other parts open, because this "measures only the extent of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce").[17]

---

[17] Indeed, the Board's argument (which the District Court accepted) is similar conceptually to the one advanced unsuccessfully by the State of Oklahoma in Wyoming. There, Oklahoma argued that it "set[] aside only a 'small portion' of the

If Cloverland proves its Maryland residency confers a cost advantage it wishes to exploit in the Pennsylvania market, but Pennsylvania law neutralizes that advantage (and thus unlawfully shields in-state handlers from price competition), heightened scrutiny will apply regardless of the existence of other competitive means that Pennsylvania has not neutralized. In demonstrating that heightened scrutiny should apply to a state law, a plaintiff like Cloverland need only prove that its out-of-state residency confers competitive advantages that are neutralized by the state law under review, thus preventing competition in the area in which the plaintiff enjoys an advantage. The plaintiff need not prove it is prevented from entering the market through competition on all possible bases.

---

Oklahoma coal market" for in-state coal producers, "without placing an 'overall burden' on out-of-state coal producers doing business in Oklahoma." <u>Wyoming</u>, 502 U.S. at 455. Here, the Board essentially contends there is no "overall burden" on handlers (including out-of-state handlers) because they may compete for business on non-price factors, even though at least part of the market would surely be more receptive to Cloverland if it were allowed to exploit its alleged out-of-state cost advantage to offer a lower price on wholesale milk. The fact that Cloverland may compete on bases in which it does not enjoy an advantage (and on which it would, therefore, have considerable difficulty displacing an incumbent handler from an established account with a retailer, especially a retailer that is primarily concerned with price) resolve the constitutional problem.

41

b.     Factual Support for District Court's Decision

Notwithstanding these errors in the District Court's analysis, we conclude it was not clearly erroneous for the Court to find that Cloverland did not sustain its burden of proving an actual raw milk cost advantage belonging to its place of origin. Cloverland's proof of its alleged cost advantage consisted primarily of testimony from Lawrence Webster, Cloverland's general manager, and Robert Havemeyer, a management consultant who testified as an expert in the costs of processing and delivering milk. Webster testified that, by not adding the over-order premium to the 65% of raw milk it purchases from independent Pennsylvania farmers, Cloverland saves about five cents per gallon, which would allow Cloverland to lower its wholesale prices enough to gain a significant price advantage over Pennsylvania competitors. Havemeyer testified that, based on a survey of Cloverland's costs during a 13-week period in the fall of 1998 (when demand was at its peak), and updated in 2002, Cloverland's variable costs (i.e., costs that vary with the volume of production) allowed it to sell its milk in Pennsylvania below wholesale minimum prices.

Notably absent from Cloverland's offer of proof, however, was any comparison to actual Pennsylvania competitors' costs, despite the fact this was crucial to demonstrating a cost advantage vis a vis those competitors. At most, Cloverland proved it was capable of selling milk for less

than the wholesale minimum, but (as explained above) this is not in itself sufficient to trigger heightened scrutiny.

Carl Herbein, who testified for the Board as an expert in milk cost accounting, conducted the comparison with Pennsylvania handlers that Cloverland's expert did not, and concluded that Cloverland's total costs rendered it less efficient than three of the four sample handlers.  Herbein explained, and the District Court agreed, that Havemeyer's calculations were unreliable because they used an unreasonably small time frame, relied only on Cloverland's variable costs (rather than looking at total costs),[18] and considered a time when demand was at its

---

[18]    We observed in <u>Cloverland I</u> that, based solely on Cloverland's evidence, it appeared that "fixing prices based on average total costs" — which includes variable costs and fixed costs "such as equipment, office space, and other 'overhead' expenses" — "significantly increases dealers' profits because it will be in their economic interest to sell additional units of milk at any price above their average variable costs, even if below their total costs.  Outside Pennsylvania, in contrast, milk dealers generally offer prices based on their average variable costs." 298 F.3d at 208.  Herbein and Havemeyer presented conflicting evidence on this point at trial, and the District Court agreed with Herbein that an analysis of total costs is necessary to take into account fully the costs of production.  Since this conclusion is supported by Herbein's testimony, and Cloverland has not shown that the testimony is demonstrably untrue, the District Court's conclusion is not clearly erroneous.

43

peak rather than a period representative of the full year. Herbein, and other witnesses offered by the Board, also explained that the cost advantage resulting from Cloverland's exemption from the over-order premium vis a vis a particular Pennsylvania competitor may be mitigated by the fact that Cloverland pays a slightly higher federal price for raw milk because it is located in Maryland,[19] and many Pennsylvania handlers avoid paying minimum wholesale prices by entering tolling agreements[20] and taking advantage of allowable

---

[19] Although Pennsylvania Areas 1 and 4 and the State of Maryland are all under the Northeast federal order, there are numerous price differentials that set various minimum prices throughout the order. See, e.g., U.S. Dep't of Agric., Northeast States Class I Differentials, available at http://www.fmmone.com/New_Zone_Diffs/ NEZoneDiffMap.pdf.

[20] A tolling agreement is a state-approved service contract whereby a handler contracts with a large retailer that is vertically integrated (i.e., processes its own milk) to process, package, and deliver milk to the retailer. Essentially, the handler acts as a proxy for the retailer's milk processing operation, and thereby avoids charging minimum wholesale prices.

We have previously held that "out-of-state dealers' ability to enter into tolling agreements [does not] meaningfully mitigate[] the burden on interstate commerce," because only about one-third of wholesale milk sales in Pennsylvania are made pursuant to tolling, and "[t]he dormant Commerce Clause

44

discounts for high volume sales, partial service (i.e., delivering the milk to a retailer but not stocking it in the cooler or ordering future inventory), and multi-store customers. None of this was reflected in Cloverland's offer of proof at trial, which relied on a straightforward comparison between the price of raw milk with the over-order premium and the price of milk without it.

Cloverland argues strenuously that the Board's data is flawed. It contends, first, that the Board purposely selected sample handlers with lower operating costs than Cloverland, and argues specifically against the inclusion of "Dealer 4",[21] which

_____

does not allow Pennsylvania to hamper out-of-state dealers in two-thirds of its wholesale market on the ground that they may compete freely in the remaining third." Cloverland I, 298 F.3d at 218 (citing Wyoming, 502 U.S. at 455). We adhere fully to this holding. Thus, the Board's evidence at trial, and argument on appeal, that tolling is available to Cloverland as a means to avoid minimum wholesale prices do not defeat Cloverland's dormant Commerce Clause challenge. But, as explained below, the plaintiff in a case like this must prove an out-of-state advantage over similarly situated in-state handlers, and in conducting this comparison the plaintiff must take account of the circumstances of the in-state handlers over which it claims to have an advantage. Since Cloverland did not analyze Pennsylvania handlers' costs, the District Court did not clearly err in relying on the Board's comparison.

[21] The relative costs of milk handlers are trade secrets, and thus the sample dairies are referenced by pseudonyms.

45

is not located within a federal order area and moves less than 25% of its total Class I milk volume into that area, and thus is only partially regulated by federal law.  See 7 C.F.R. § 1001.7; see also Sani-Dairy, Div. of Penn Traffic Co, Inc. v. Espy, 939 F. Supp. 410, 412 (W.D. Pa. 1993) (same under earlier federal order regulations).  Herbein testified, and Cloverland does not dispute, that a partially regulated handler like Dealer 4 need not account to the Producer Settlement Fund, and is therefore able to pay producers more for raw milk (which gives it a price advantage over fully regulated handlers, and a corresponding cost advantage when the market price of raw milk is higher than the federal minimum).  See 7 C.F.R. § 1000.76.  Since Cloverland is fully regulated federally, and must account to the Producer Settlement Fund, it argues a comparison with the partially regulated Dealer 4 is irrelevant.

Cloverland's argument misses the mark.  Dealer 4 would clearly be a competitor in the Pennsylvania market; although Dealer 4 cannot sell more than 25% of its total milk volume into a federal order area and remain partially regulated, it could still compete with Cloverland for retail outlets in Areas 1 and 4 with the milk it does move into the order area.  Dealer 4 is not, therefore, a wholly irrelevant comparison.  Cloverland's argument is really addressed to whether Dealer 4 is a proper representative for comparison.  Yet Cloverland had every opportunity to submit evidence of similarly situated Pennsylvania handlers with comparatively higher costs, and it failed to do so.  As the Board was the only one to submit

46

evidence of comparative costs, the District Court did not clearly err in relying on the Board's sample.

Second, Cloverland argues Herbein erroneously relied on the "plant blend" cost of raw milk (i.e., the weighted average of the costs of different classes of milk used by the plant, which is paid to producers), rather than a segregated Class I price, in conducting his analysis of comparative costs. This, according to Cloverland, artificially lowered the costs of plants with less Class I usage than Cloverland. The Board counters that the plant blend method of calculating costs is the norm in the industry and comports with generally accepted accounting practices.

Although Cloverland's argument may have some merit,[22]

---

[22] Herbein justified his reliance on the plant blend cost — as does the Board in its arguments on appeal — by noting that plant blend is an accepted method of pricing the cost of raw milk, and reflects the way handlers actually operate (i.e., by purchasing Grade A raw milk and only later deciding how it will be classified). While we have no doubt plant blend is recognized and accepted in the industry, here Cloverland contends that its exemption from the over-order premium (which applies only to purchases of Class I raw milk) gives it an advantage over other purchasers of Class I raw milk. Reliance on the plant blend cost in determining Cloverland's advantage over other handlers makes sense only if Cloverland and the Pennsylvania handlers to which it is compared have the same

we note that it submitted no evidence that the sample handlers (which Herbein testified were "very similar" to Cloverland in terms of size, volume, and gross sales) had appreciably different Class I usage. Havemeyer provided evidence of Cloverland's Class I costs, but did not compare these to any actual Pennsylvania competitors, and the District Court expressly found his study unreliable due to its limited time frame and examination of only variable costs. Again, under these circumstances, we cannot conclude that the District Court

---

Class I usage. Otherwise, as Cloverland argues, the comparison will be flawed: because it has a high Class I usage, its plant blend cost will be artificially higher than a plant with lower Class I usage, even though the cost of its Class I milk alone may be lower than the Pennsylvania competitor.

Of course, it may be difficult to calculate a discrete "Class I" cost because if (as the Board persuasively argued, and the District Court found) it is appropriate to consider the total costs of production — including fixed costs like capital investment, facilities, equipment, and other overhead — in deciding whether one handler has a cost or efficiency advantage over another, it would be an arduous task to separate out the portion of fixed costs attributable to the production of Class I milk, as many fixed costs are directed at processing raw milk regardless of its end use. It may be, then, that plant blend is an unavoidable consequence of the way handlers actually work, though we still think it most useful if the two handlers compared use roughly the same amount of raw milk as Class I. But, as we explain, in this case Cloverland's failure of proof makes it unnecessary to resolve this question.

committed clear error by relying on the only comparative evidence before it.

\* \* \* \* \*

To be sure, we do not mean to suggest that a defendant in a case such as this may defeat heightened scrutiny merely by showing that the plaintiff does not have a competitive advantage over some of its putative competitors. Such a rule would be at odds with the well-established principle that "'a statute may be invalid if it favors only a single or finite set of businesses.'" Cloverland I, 298 F.3d at 214 (quoting Harvey & Harvey, 68 F.3d at 798). But this does not relieve a plaintiff like Cloverland of its burden of proving, as part of its prima facie case of discrimination, that it has an actual competitive advantage over some of its prospective competitors because it is an out-of-state firm. Cloverland should have established that its exemption from the over-order premium gave it a relevant cost advantage over similarly situated Pennsylvania competitors that translated into an ability to sell wholesale milk at a lower cost.[23] Had it

_____

[23] Herbein's testimony indicated that Cloverland had a cost advantage over one of the four sample dairies offered by the Board (which Herbein selected because they were similarly situated to Cloverland), but Cloverland offered no proof that this cost advantage arose because of its out-of-state status. In any event, given the totality of the Board's evidence, the District Court did not clearly err in deciding (implicitly) that evidence of a cost advantage over one similarly situated Pennsylvania

49

done so, the Board could (of course) have attempted to rebut this proof by showing that Cloverland did not have an actual cost advantage over its competitors, or its cost advantage was not related to its out-of-state status. The District Court would then have had to weigh the evidence. But Cloverland's evidence did not compare its costs to the costs of its competitors, and thus the Court did not commit clear error when it held that Cloverland failed to sustain its burden of proving an out-of-state competitive advantage vis a vis its Pennsylvania competitors that is neutralized by the Commonwealth's mandatory minimum wholesale prices. In this context, we do not have facts calling for heightened scrutiny.

### C. **Pike Balancing**

Having concluded that Cloverland failed to prove the applicability of heightened scrutiny, we proceed to the Pike balancing test. Pike, 397 U.S. at 142. As noted, when a law "effectuate[s] a legitimate local public interest, and its effects on interstate commerce are only incidental," the court must determine whether "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Id. The District Court concluded that Pennsylvania's mandatory minimum wholesale milk prices survive this test.

---

handler, owing possibly to Cloverland's exemption from the over-order premium, was not sufficient to trigger heightened scrutiny.

50

Cloverland argues that the "benefits" conferred by the minimum wholesale prices are merely economic protectionism, "the very evil the Commerce Clause seeks to prohibit." Appellant's Br. at 40. The District Court disagreed, crediting the Board's witnesses who testified that minimum wholesale prices make it easier for handlers to pay the over-order premium. The over-order premium, in turn, helps small, independent dairy farms remain profitable without joining cooperatives, which fosters market diversity and prevents a possible future rise in retail prices. Indeed, the District Court was persuaded by expert testimony offered by the Board that the abolition of minimum prices in California led to consolidation of farms and handlers into a few dominant market participants, resulting eventually in a sharp rise in consumer prices. The District Court also credited testimony offered by the Board that if small farms went out of business, "the agricultural infrastructure built around the industry will also be negatively affected, resulting in the loss of dealers, feed stores, veterinarians, and other business[es] that support the dairy industry." Cloverland II, slip op. at 9, 26.

Although Cloverland presented testimony tending to establish the opposite — that the abolition of minimum wholesale prices would have no adverse effect on the dairy industry, which would continue to thrive as it does in other states — the District Court was entitled to base its ultimate factual conclusion on the Board's evidence. "As we have recognized, the clearly erroneous standard of review does not

51

permit an appellate court to substitute its findings for those of the trial court. It allows only an assessment of whether there is enough evidence on the record to support those findings. That a different set of inferences could be drawn from the record is not determinative. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Scully v. US WATS, Inc., 238 F.3d 497, 506 (3d Cir. 2001) (citations and internal quotation marks omitted); see Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985) (same).

The next question, then, is whether the putative benefits of the Milk Law are outweighed by a significant incidental burden on commerce. Cloverland offered testimony that the minimum prices prevented it from competing in the Pennsylvania milk market, and thus the burdens on interstate commerce were substantial. As noted, the Board offered testimony that several other forms of competition exist in the Pennsylvania market,[24] and therefore the minimum wholesale

---

[24] Although we held above that evidence of other competitive outlets is not relevant to the question of whether heightened scrutiny applies — because, as explained, the only relevant inquiry in making that determination is whether an out-of-state competitive advantage is neutralized by Pennsylvania law — the presence of other forms of competition is one of many factors that may be taken into account under the Pike balancing test, where the inquiry concerns the magnitude of the incidental burden on commerce and the countervailing benefits of the law.

52

prices do not entirely prevent new competitors from challenging incumbent handlers and moving their milk interstate. As with the benefits of the law, the District Court was forced to choose between conflicting evidence, and we cannot say its choice was clearly erroneous. Thus, we affirm the District Court's holding that Cloverland failed to sustain its burden of proving that the incidental burdens of Pennsylvania's minimum wholesale milk prices outweigh the putative benefits.

## V. **Conclusion**

In Cloverland I, we expressed our unease with the fact that Pennsylvania is the only state with mandatory price controls of the sort described in this case, while its milk industry (dominated by in-state firms) is flourishing. In our view, the Board's argument that the price controls are the only thing preventing a vulnerable milk industry from complete collapse (and a concomitant disruption in the supply of milk to Pennsylvania's residents) rings hollow in light of the undisputed evidence that Pennsylvania exports far more milk than its residents consume,[25] and other states appear to do quite well

---

[25] In Cloverland I, we noted that "Pennsylvania's dairy industry is among our nation's most productive. Milk production in the Commonwealth outpaces consumption by roughly 350%. Annual production per-capita [for Pennsylvania residents] is around 900 pounds; consumption [by Pennsylvania

53

without mandatory minimum prices. It is quite likely, as we stated on the limited factual record in Cloverland I, that preventing competition based on price works to the advantage of Pennsylvania's resident handlers by helping maintain their dominance in the market. Indeed, there is apparently no political incentive for in-state handlers to resist the price controls, as evidenced by the fact that the Pennsylvania Association of Milk Dealers has intervened in support of the challenged law. Cf. West Lynn Creamery, 512 U.S. at 200-01 ("[O]ne would ordinarily have expected at least three groups to lobby against the order premium, which, as a tax, raises the price (and hence lowers demand) for milk: dairy farmers, milk dealers, and consumers. But because the tax was coupled with a subsidy, one of the most powerful of these groups, Massachusetts dairy farmers, instead of exerting their influence against the tax, were in fact its primary supporters. . . . [Thus,] [the] State's political processes can no longer be relied upon to prevent legislative abuse.").

Cloverland failed to prove its case, however, and the District Court cannot be faulted for relying on the evidence presented at trial. But our opinion today does not settle the question of the Pennsylvania Milk Marketing Law's constitutionality. Indeed, if another out-of-state plaintiff can prove it has competitive advantages over actual Pennsylvania competitors belonging to its place of origin (whether by virtue

residents] per-capita is merely 200 pounds." 298 F.3d at 206.

54

of its exemption from the over-order premium or otherwise),[26] and these advantages translate into an actual ability to sell milk for less than similarly situated Pennsylvania handlers that is neutralized by the minimum wholesale prices, heightened scrutiny would apply.[27] Cloverland lost this case because its evidence was insufficient, but the constitutionality of Pennsylvania's minimum wholesale prices remains unresolved.

In this context, the District Court's judgment is affirmed.

---

[26] The District Court noted, for example, that "if . . . [a] competitive price advantage arose from [out-of-state] firms' ability to buy cheap local milk, the wholesale price floor would fall under a heightened scrutiny analysis." Cloverland II, slip op. at 18 n.13.

[27] We have already held that "[i]f they are subject to heightened scrutiny, the wholesale price floors cannot satisfy the dormant Commerce Clause" because Pennsylvania could "achieve its objective through alternative measures that do not discriminate against interstate commerce" — by acting as a market participant, for example. Cloverland I, 298 F.3d at 215. This holding would, of course, apply in any future challenge to the minimum wholesale prices.